NAME: Joseph Massaro
Reg. No. 83413-020

ADDRESS:
USP-Lewisburg
P.O. Box 1000
Lewisburg, Pa. 17837-1000

or PLACE OF CONFINEMENT & PRISON NUMBER

*Note: If represented by an attorney, his name, address & telephone number*

*Note: It is your responsibility to notify the Clerk of the Court, in writing of any change of address*

FILED
SCRANTON
JAN 31 2017
PER ___ DEPUTY CLERK

# United States District Court

JOSEPH MASSARO
FULL NAME: (Include name under which you were convicted)
*Petitioner,*

*vs.*

DAVID J. EBBERT, WARDEN, USP-Lewisburg
NAME OF WARDEN(or other authorized person having custody of petitioner)
*Respondent.*

CASE NO: 3:17-cv-180
(To be supplied by the clerk of the United States District Court)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN FEDERAL CUSTODY 28 U.S.C. § 2241

## INSTRUCTIONS - READ CAREFULLY

This petition shall be legibly handwritten or typewritten. signed by the petitioner, under penalty of perjury. You must set-forth *CONCISELY* the answer to each question in the proper space on the form. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury.

You must not attach separate pages to this except that *ONE* separate additional page is permitted in answering Question No. 9.

Upon receipt of a fee of $5.00, you petition will be filed if it is in proper order.

If you are seeking leave to proceed in forma pauperis (without paying the $5.00 fee and other court costs), then you must also execute the declaration on the last page, setting forth information which establishes your inability to pay the fees and cost of the proceedings or to give security therefor. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution. If you prison account exceed $25.00, you must pay the filing fee as required by the rule of the district cour .

When the petition is completed, the *original and two copies* must be mailed to the Clerk of the United States District Court for the

Only one sentence, conviction or parole matter may be challenged in a single petition. If you challenge more than one, you must do so by separate petitions.

Petitions which do not conform to these instruction will be returned with a notation as to the deficiency.

PLEASE COMPLETE THE FOLLOWING: (check appropriate number)

This petition concerns:

1 x☒ a conviction
2 x☒ a sentence
3. ☐ jail or prison conditions
4. ☐ prison discipline
5. ☐ a parole problem
6. ☐ other

# PETITION

1. Place of confinement USP-Lewisburg

2. Name and location of court which imposed sentence Southern District of New York

3. The indictment number or numbers (if known) upon which, and the offense or offenses for which, sentence was imposed:
(a) 92-cr-528(MGC); 10 counts, including conspiracy to commit RICO, RICO murder,
(b) and substantive violations, all in violation of 18 U.S.C. §§§ 1962(c)(d); and
(c) 1959(a)(1)(2) and (5), and 7 counts relating to RICO offenses.

4. The date upon which sentence was imposed and the terms of the sentence:
(a) October 27, 1993; life
(b)
(c)

5. Check whether a finding of guilt was made:
(a) ☐ After a plea of guilty
(b) ☒ After a plea of not guilty
(c) ☐ After a plea of nolo contendere

6. If you were found guilty after a plea of not guilty, check whether that finding was made by:
(a) ☒ a jury
(b) ☐ a judge without jury

7. Did you appeal from the judgment of conviction or the imposition of sentence?
☒ Yes ☐ No

8. If you did appeal, give the following information for each appeal:
(a)(1) Name of Court Second Circuit Court of Appeals
(2) Result Denied
(3) Date of Result 1995
(4) Citation or number of opinion 57 F. 3d 1063 (2nd Cir. 1995)

(5) Grounds Raised *(list each)*

(A) Error to admit the bullet evidence

(B)

(C)

(D)

(b)(1) Name of Court Southern District of New York

(2) Result Denied

(3) Date of result Oct. 5, 2004

(4) Citation or number opinion 97-cv-2971

(5) Grounds raised (list each)

(A) Section 2255 motn, Ineffective Assistance of Counsel

(B)

(C)

(D)

CAUTION: If you are attacking a sentence imposed under a federal judgment, you must first file a direct appeal or motion under 28 U.S.C. § 2255 in the federal court which entered judgment.

9. State *CONCISELY* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, attach a SINGLE page only behind this page.

CAUTION: If you fail to set forth all grounds in this petition, you may be barred from presenting additional ground at a later date.

(a) Ground One See Attachments

Supporting *FACTS* (tell your story *BRIEFLY* without citing cases or law).

CAUTION: You must state *facts not conclusions* in support of your grounds. A rule of thumb to follow is - who did exactly what to violate your rights at what time or place.

See Attachments

(b) Ground Two See Attachments

Supporting *FACTS* (Tell your story *BRIEFLY* without citing cases or law).

See Attachments

(c) Ground Three See Attachments

Supporting *FACTS* (Tell your story *BRIEFLY* without citing cases or law).

See Attachments

(d) Ground Four See Attachments

Supporting *FACTS* (Tell your story *BRIEFLY* without citing cases or law).

See Attachments

10. Have you ever filed previous petitions for habeas corpus, motions under Section 2255 of Title 28, United States Code, or any other applications, petitions or motions with respect to this conviction?
☒ Yes ☐ No

11. If your answer to Question No. 10 was yes, give the following information:

(a)(1) Name of Court See Information above

(2) Nature of proceedings

(3) Grounds raised

(4) Result

(5) Date of Result

(6) Citation or numbers of any written opinions or orders entered pursuant to each disposition.

(b)(1) Name of Court Second Circuit Court of Appeals

(2) Nature of proceedings 2255

(3) Grounds raised New Law

(4) Result Denied

(5) Date of Result October 17, 2016

(6) Citation or numbers of any written opinions or orders entered pursuant to each disposition.

See Attachments

12. If you did not file a motion under Section 2255 of Title 28, United States Code, or if you filed such a motion and it was denied, state why your remedy by way of such motion is inadequate or ineffective to test the legality of your detention.

See Attachments

13. Are you presently represented by counsel? ☐ Yes ☒ No

If so, name, address and telephone number N/A

Case name and court N/A

14. If you are seeking leave to proceed in *forma pauperis*, have you completed the declaration setting forth the required information?

☐ Yes ☒ No,

WHEREFORE, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on
*(date)*

Joseph Manaro
*Signature of Petitioner*

## PRELIMINARY STATEMENT

A writ of habeas corpus should be granted here because Petitioner Massaro is illegally held in the custody, comfinement or restraint of David J. Eddert, Warden USP-Lewisburg, Union County, Pennsylvania. The instant confinement is illegal because Massaro is being continuously restrained and deprived of his right to liberty by virture of mittimus issued by United States District Judge Miriam Goldman Cedarbaum in the Southern District of New York. On July 26, 1994 Massaro was sentenced to serve a mandatory minimum term of life imprisonment without authority of law.

That is having exhausted all other available means or remedies in this regard, Massaro is left with no other alternative than to seek relief from the violations described herein, which he in good-faith believes represent a level of constitutional infirmity that authorizes this Court to accept this writ for review.

## QUESTIONS PRESENTED

I. Whether A Intervening Change In The law Can Support A Claim of Actual Innocence? That Determination Must Be Made By A Jury of Massaro's Peers Based Upon A Valid Indictment For That Crime, A Properly Instructed Jury, And Proof Beyond A Reasonable Doubt.

II. Whether A Intervening Change In The Law Can Support An Ex Post Facto Claim? Where The Sentencing Court Used A November 1990 Guidelines That Called For A Greater Punishment Than The September 1990 Guidelines That Was In Effect When Massaro Completed His Crime.

III. Whether A Intervening Change In The Law Can Support A Claim Of Actual Innocent Of The Enhanced Sentence? Where The Court Used U.S.S.G. § 2A1.1, The Guidelines To First-Degree Premeditated Murder, Rather Than §2A1.2, Which Applies To Non-Premeditated Murders.

IV. Whether The BOP Abused Its Discretion, Where Its Decision Was Contrary To Congress' Intent? Where The Facts Of The Case and Rehabilitation Was Sufficient Justification For A sentence Reduction.

MEMORANDUM OF LAW IN SUPPORT OF WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 et. Seq. AND § 2255(e)

## INTRODUCTION

This memorandum of points and authorities in support of the accompanying petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 et. seq., is submitted by Petitioner Joseph Massaro, (hereinafter, "Petitioner"), proceeding pro-se, and reflects his sincere belief that a writ of habeas corpus should be issued because he is being continuously restrained and deprived of his rightful liberty by virture of excess of authority, in violation of his rights protected by the United States Constitution and laws of the United States.

As such, Petitioner states that this action does have merit. Having exhausted all other available means or remedies in this regard, Petitioner is left with no other alternative than to seek relief from the violations described herein, which he in good faith believes represents a level of constitutional infirmity that authorizes this Court to accept this writ for review.

## CUSTODY AND VENUE

Petitioner's custodian is D. Eddert, Warden of USP-Lewisburg in Lewisburg, Pennsylvania. USP-Lewisburg lies within the Middle District of Pennsylvania, and thus this Savings Clause application is governed by the law of the Third Circuit.

## JURISDICTION

Federal District Courts have the authority to dispose of habeas corpus matters as "law and justice require." 28 U.S.C. § 2243. A challenge to the validity of a federal conviction and sentence is generally brought as a habeas corpus pursuant to § 2255, while a petition concerning the manner or execution of a sentence is appropriate under § 2241. Though presenting two (2) distinct avenues for a prisoner's challenge to his incarceration, these petitions overlap through the "savings-clause" mechanism of § 2255(e).

Where a Petitioner seeks to file a successive habeas petition but cannot meet

the requirements of the § 2255(h) exception, he may look to the "savings clause" of 28 U.S.C. § 2255(e) for recourse: "An application for writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." Thus, where the remedy under § 2255 is inadequate or ineffective, the savings clause allows a federal prisoner to bring a claim challenging his conviction or imposition of sentence under § 2241.

Petitioner observes that the Third Circuit has not explicitly addressed whether a sentence error (rather than an erroneous conviction) can ever warrant the application of § 2255(e)'s savings clause. See Pollard v. Yost, 406 Fed. App'x 635, 637-38 (3rd Cir. 2011). Following Okereke v. United States, 307 F.3d 117, 120-121 (3rd Cir. 2002), the Third Circuit has repeatedly made clear that Apprendi claims, (if not all sentencing error claims), do not qualify for § 2255(e)'s savings clause. Citing, Davis v. United States, 417 U.S. 333, 346 (1974), the Okereke court held that the prisoner must show that "the substantive law has changed such that the conduct of which the prisoner was convicted is deemed not to be criminal." While Davis did not address whether the savings clause permits what is effectively a second or successive motion under the miscarriage of justice standard. That is, the Court had no occassion to consider the availability of the savings clause relief for any other type of challenge. See now Illinois v. Lidster, 540 U.S. 419, 424 (2004)("[G]eneral language in judicial opinions [should be read] as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not considering"). In actuality, this Court has not squarely addressed whether a sentencing error may be fundamental so as to warrant resort to the savings clause. That question should be addressed here.

A habeas petition may be brought pursuant to § 2241 when a sentence exceeds the maximum prescribed by statute. Serving a sentence imposed under mandatory guidelines shares similarities with serving a sentence imposed above the statutory maximum. Both sentence are beyond what is called for by law, and both raise a fundamental fairness issue. To deny relief where a sentence enhancement exceeds the statutory range set by Congress would present Separation-of-Powers concerns. See Hill v. Masters, 2016 U.S. App. Lexis 16425 (6th Cir. Sept. 7, 2016)(Ruling that federal prisoner could utilize savings clause of § 2255 to challenge misapplication of Sentencing Guidelines in a § 2241 habeas petition); Narvaez v. United States, 674 F.3d 621, 627-28 (7th Cir. 2011)(Same); and Williams v. Warden, Fed. Bureau of Prisons, 713 F.3d 1332, 1343 (11th Cir. 2013)(interpreting prior precedent to allow application of the savings clause "when a fundamental defect in sentencing occurred and the Petitioner [has] not had an opportunity to obtain judicial correction of that defect earlier").

Practically, this means "that the privilege of habeas corpus entitles the prisoner to an opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." Boumediene v. Bush, 533 U.S. 732 (2008). And, in Holland v. Florida, 560 U.S. 631, 646 (2010), the Supreme Court made clear that AEDPA's statute of limitations "does not set-forth an inflexible rule requiring dismissal whenever its clock has run." Id at 645. The Holland Court was very clear: First, that Courts must be flexible and exercise their equitable powers on a case-by-case basis instead of blindly following "mechanical rules." Id. at 650. Second, a Court is not inexorably bound to follow past precedent when doing so would prevent it from "accord[ing] all the relief necessary to correct.... particular injustices." Id. Instead, Courts should "follow a tradition in which Courts of equity have sought to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity." Id. Despite this, most lower Courts do exactly what Holland warns against by applying a rigid rule that results in gross injustice.

BACKGROUND AND HISTORY OF CASE

Stated below is the relevant background and history of case, as it relates to Petitioner Joseph Massaro, (herein, "Petitioner" or "Massaro"):

On June 9, 1992, Massaro was charged in ten counts of an eighteen count indictment. The indictment alleged that Massaro was a soldier in the Luchese Organized Crime Family. Among other crimes, the indictment charged Massaro with the murder of Joseph Fiorito, a member of the crime family.

The Government's key witness with respect to the murder charge was Patrick Esposito, another member of the crime family who became a cooperating witness for the government. Esposito testified that Massaro directed him to lure Esposito to an abandoned house on Long Island, where Massaro shot him once in the head. That thereafter, he and Massaro then dragged Fiorito's body out of the house and placed it in the back seat of the car Fiorito had driven to the house. That as they drove the car into New York City, Massaro who was in the passenger seat turned around and shot Fiorito again in the head. Esposito and Massaro then abandoned the car in Queens, where it was discovered by the police.

Esposito returned home and told his girlfriend that Fiorito had been killed, she reported the crime to the police, who arrested Esposito. Shortyly after being charged with murder, Esposito began cooperating with Federal authorities who were investigating racketeering crimes.

During the opening statement of Massaro's trial, the defense informed the jury that the evidence would show that Esposito murdered Fiorito and that there was not a single piece of scientific or other evidence outside of Esposito's self serving testimony that would connect Massaro with the murder.

After the jury trial, Massaro was convicted of all counts on October 27, 1993. The Second Circuit affirmed Petitioner's conviction in an unpublished opinion on May 18, 1995. Petitioner then filed a Motion for New Trial and a petition for relief under 28 U.S.C. § 2255. Petitioner's claim was dismissed. See, Massaro v. United

States, 2000 U.S. Dist. LEXIS 17170 (S.D.N.Y. Nov. 29, 2000). The Second Circuit affirmed the dismissal of Petitioner's §2255 Motion. Massaro v. United States, 27 Fed. Appx. 26 (2d Cir. 2001). The Supreme Court reversed and held that a petitoner does not procedurally default claims of ineffective assistance by raising them for the first time in a collateral proceeding. See Massaro v. United States, 538 U.S. 500 (2003). The Second Circuit accordingly remanded Massaro's petition to the district court. Where it was denied again; and affirmed by the Court of Appeals. Thereafter, all post-conviction motion(s) and recently an application for authorization to file a successive petition was denied. (See attachments).

(i) Unique Circumstances:

Massaro was convicted of ten counts, including conspiracy to commit racketeering ("RICO"), a substantive RICO violation, murder to further defendant's position in the racketeering enterprise in violation of 18 U.S.C. §1962(c)(d) and §1959(a)(1)(2) and (5), and seven counts corresponding to predicate acts to support his conviction of the RICO offense.

Relevant herein is the conspiracy to murder and murder in the September 20, 1990 death of Joseph Fiorito, the underlying charge to which this racketeering murder conspiracy and murder charge referred in the indictment was "New York Law," 1/ a non-premeditated murder in the second degree under New York State Law. The jury expressly was instructed to consider only second degree murder and was only instructed on the elements of second degree. Nevertheless, at sentencing, the district court imposed sentence under U.S.S.G. §2A1.1, the guideline for first degree pursuant to 18 U.S.C. §1111. This resulted in an offense level of 43, calling for a mandatory minimum sentence of life without parole. Under the applicable guidleine for non-premeditated murder, U.S.S.G. §2A1.1., the maximum level would have been level 33 (i.e., 168-210

1/ The indictment does not allege which subsection of the Penal Law (i.e., §§125.25 or 125.27).

months), as a matter of law. The sentence imposed is over the maximum authorized by the law, based on the actual crime of conviction and the applicable guideline in effect at the time of conviction.

In arriving at the guideline to use for sentencing in this case the court started out on the right course. It referred first to U.S.S.G. §2E1.1 which then referred the court to the "offense level applicable to the underlying crime or racketeering activity." It is from this point that the court went wrong in its guideline selection. The court turned to U.S.S.G. §2A1.1., the guideline applicable to first-degree premeditated murder, rather than §2A1.2, which applies to §1111 non-premeditated murders. See United States v. Hanson, 264 f.3d 988, 996 (10th Cir. 2001).

This was error for several reasons. First, the indictment charged exclusively second-degree, non-premeditated murder. Secondly, the court expressly instructed the jury that premeditation was not relevant to their deliberations, not an element of the crime charged, and not to be considered by them. Third, the version of U.S.S.G. §2A1.1. used by the court in sentencing Petitioner Massaro was one which did not even come into effect until November 1, 1990, well after the crime.

Thus, Petitioner's constitutional rights to a fair jury trial, to Effective Assistance of Counsel, to Due Process of Law, and under the Grand Jury and Ex Post Facto Clause were violated in connection with his sentencing.

(ii) Indictment and Relevant Statutes

The relevant racketeering act which Massaro was found guilty of was the crime of murder in the second degree under the law of New York State, which is New York's highest category of murder of general applicability. New York law does not employ the concept of "Premeditated" murder. Both the first and second degree murder statutes apply when the defendant has killed "with intent to cause the death of another person." See, N.Y. Penal Law §§125.5 and 125.27.

Here, the indictment alleges in relevant part that on September 20, 1990, in the State of New York, Massaro and Esposito "together with others known and unknown,

unlawfully, willfully and knowingly murdered Joseph Fiorito, in violation of the New York Penal Law."

The only applicable law to the Fiorito murder was New York Penal Law §125.25. The statute defines that murder as being second degree because first degree murder is defined in §125.27 and is limited to, for e.g., the murder of specific victims such as police officers, correctional officers, a witness to a crime or by a defendant who at the time of the killing was in prison.

"Premeditation" is not an element of §125.25 and premeditation is, or may be argued to be, an element of murder in the first degree under 18 U.S.C. §1111, then that portion of §1111 providing that "any other murder is murder in the second degree" and the lower corresponding second-degree murder guideline, U.S.S.G. §2A1.2, and its base offense level of 33 rather than 43 should have been applied in this case. It is crucial to note that the application note to the guideline provides: "If the underlying conduct violates State Law, the offense level corresponding to the most analogous federal offense is to be used."

The only federal statute defining murder in the first degree is §1111 which is restricted to such murders committed within the Special Maritime and Territorial Jurisdiction of the United States. Murder in the first degree is defined as a murder "perpetrated by poison, lying in wait or any kind of willful, deliberate, malicious and premeditated killing." See 18 U.S.C. §1111.

Thus, once the District Court selected federal murder under 18 §1111 as the federal analog to New York's second degree murder, it should have seen clearly from the statute itself that, other than for felony murder, not at issue here, the statute clearly made premeditated murder first degree and non-premeditated murder ("any other murder") second degree. Similarly, the guidelines make it perfectly clear and simple: premeditated first degree murder under §1111 gets sentenced under §2A1.1 and second degree non-premeditated murder under §1111 (any murder other than felony murder or premeditated murder) gets sentenced under §2A1.2. The language of these statutes

proves that point.

In United States v. Hanson, 264 F.3d 988 (10th Cir. 2001), the court was called upon to decide the precise question of whether it is appropriate to sentence a defendant who has been convicted of second degree non-premeditated murder as if he had been convicted of first degree premeditated murder under the federal sentencing guidelines. The court held that this was not constitutionally permissable to impose a sentence for first degree murder on a defendant convicted of second degree murder because the guidelines themselves drew the distinction specifically based on the factor of premeditation, with that factor serving as the exclusive dividing line between the two for §1111 murder. Id. at 995-996. The court specifically noted the distinction in the context of comparing §§2A1.1 and 2A1.2. Id at 996. See also, Jamison v. United States, 4 Fed Appx. 88 (2nd Cir. 2001), remanding case for consideration of whether it may have been ineffective assistance of counsel for sentencing counsel to have failed to challenge the use of §2A1.1, instead of §2A1.2.

(iii) Special Maritime And Territorial Jurisdiction-

The case law addressing the scope of §1111 are very few but construe it as being applicable only to murders "within the Special Maritime and Territorial Jurisdiction of the United States". See 18 U.S.C. §1111(b). In United States v. Bin Laden, 92 F.Supp. 2d 189 (S.D.N.Y. 2000), Judge Sand wrote: "The actual section 1111, however, incluses its own jurisdictional elements, viz, 1111(b)-which limits section 1111 as a whole to murders committed [w]ithin the Special Maritime and Territorial Jurisdiction of the United States." (emphasis added). See also, United States v. Parker, 622 F.2d 298, 301 (8th Cir. 1980)("It is essential to...the premeditated murder charges in this case that the action constituting [that] offense took place within the Special Maritime and Territorial Jurisdiction of the United States" and, therefore, §1111 was not applicable in this case.

(iv) Ex Post Facto Violation-

The sentence imposed in this case also was unlawful because the court used a

formulation of the guideline that only came into affect after November 1, 1990 (See Amendments 310 and 311); where as, the crime charged occured on September 20, 1990 before the amended language of §2A1.1 which was used in this case(expanding its coverage), even came into effect. Prior to November 1, 1990, unless a person were convicted of the crime of first degree murder as defined under 18 U.S.C. §1111 (requiring pre-meditation), only U.S.S.G. §2A1.2 could be applied. This principle applies to both the murder conspiracy and the murder charge.

Under U.S.S.G. §1B1.11(b)(i) the Sentencing Court must use the guidelines manual in effect on the date the offense of conviction was committed, if the use of any other guidleine manual would result in an increased punishment. This is required under the Ex Post Facto Clause. Prior to November 1, 1990, the effective date of amendment 310 to the guideline, a murder had to be "willful, deliberate, malicious, and premeditated," to qualify for sentencing under that guideline. Even after the Amendment's effective date, only a "premeditated" murder or other felony murder (not applicable here) could be sentenced under §2A1.1. Any other murder had to be sentenced under §2A1.2. §2A2.1, with a base offense level of 20 was the only applicable guide-line for the conspiracy and the district court erred there as well by using a version not in effect at the relevant time.

In United States v. Failla, 1993 U.S. Dist. LEXIS 18507 (E.D.N.Y. 1993)(Docket No. 93-CR-294; pre-sentencing), The Probation Office for the Eastern District of New York expressly wrote that it would create a "Ex Post Facto issue" if a sentence were imposed (where a murder pre-dated November 1, 1990) based on a cross-reference to U.S.S.G. §2A1.1 because the guidelines were only amended to apply that cross-reference effective November 1, 1990. Accordingly, the Probation Office noted, the base offense level of 43, applicable under U.S.S.G. §2A1.1., could not be used as a matter of law. Instead, only §2A1.2, could be used.

As in Failla, §2A1.2 is the guideline which the court should have applied to Massaro as a matter of law. Offense level 33 would be the applicable level under the

facts of this case, (i.e., non-premeditated murder) in the crime charged the maximum sentence that lawfully could have been imposed on Massaro was a sentence in the range of 168-210 months. Thus, this clearly constitutes ineffectiveness of sentencing counsel and was far more egregious an error than that which the Supreme Court found reversible in Glover v. United States, 531 U.S. 198, 200 (2001)(ineffectiveness led to error of from 6-21 months-as opposed to here, a mandatory minimum term of life imprisonment without parole). (emphasis added).

Furthermore, this Court in United States v. Guerrero, 2014 U.S. Dist. Lexis 141811 (S.D.N.Y. 2014)(citing United States v. Walker, 142 F.3d 103, 113 (2nd Cir. 1998)), held that a New York State murder (like the one in this case) is an analogous crime is second degree murder. Thus, second degree murder guidelines are appropriately applied here. guerrero, supra.

(v) Massaro's Rehabilitation While Incarcerated Entitles Him To Early Release:

Relevant Facts-

Petitioner Massaro sought Compassionate Release uner Program Statement # 5050.49; 18 U.S.C. § 3582(1)(A) and § 4205(g). Which provides that consideration for a reduction in sentence may be given to inmates ages 65 or older who have served the greater of 10 years or 75% of the term of imprisonment.

After a review the Federal Bureau Of Prisons ("BOP") determined the following: That Petitioner met the age criteria and initial review for service of the greater of 10 years or 75% of the term of imprisonment to which he was sentenced; however, the BOP reviewed other relevant felons in the case and determined that "a reduction in sentence would minimize the severity of [Petitioner's] offense." (See attachments).

Massaro appealed the ruling to the Central Office Administrative Remedy, Office of General Counsel. On July 30, 2015, Massaro's case was remanded to the institution for reconsideration. (See attachment). On September 25, 2015, the BOP reviewed Massaro's two prior requests for a reduction in sentence, and again denied Massaro's request.

Notable under "comments for review staff," the Warden David J. Ebbert disagreed with the Unit Team. Noting that Massaro's "request should not be denied at this time. The Unit Team should submit complete packet for [reduction in sentence] processing." Id.

Discussion-

As supported by the Warden.s recommendation Petitioner's case falls within 18 U.S.C. § 3582(c)(1)(A)(ii). Which provides for modification of a sentence if a defendant, "is at least 70 years old and has served at least 30 years in prison, and is no longer a danger to the safety of the community." Id Because Massaro is requesting an early or compassionate release or reduction in his sentence based on §3582 and his conduct while in prison, this court should find that his petition is a challenge to the execution of his sentence, rather than to the underlying conviction. Thus, 28 U.S.C. §2241 is the proper vehicle for review. In addition, Massaro has exhausted his adminstrative remedies under 28 C.F.R. 571.60,et. Seq. By requesting that the Warden reconsider his initial decision, by appealing the Warden's final decision to the BOP's Regional Director, and by appealing the Regional Director's denial to the BOP's Central Office. In sum, here the court should hold that the BOP's interpretation of 18 U.S.C. § 3582(c)(1)(A)(ii) was unreasonable as it was applied to Massaro.

Having exhausted all other available means or remedies in this regard, Massaro is left with no other alternative than to seek relief from the violations described herein, which he in good faith believes represent a level of constitutional infirmity that authorizes this court to accept this writ for review. habeas Corpus review under §2241 "allows a federal prisoner to challenge the 'execution' of his sentence." Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 241 (3rd Cir. 2005). Review is available "where the deprivation of rights is such that it necessarily impacts the fact or length of detention." Leamer v. Fauver, 288 F.3d 532, 540 (3rd Cir. 2002). In Suggs v. Bureau of Prisons, 2008 U.S. Sist. LEXIS 62078, 2008 WL 2966740 *4 (D. N.J. July 31, 2008), it was reiterated that in cases where "a judgment in Petitioner's favor would not affect the fact or duration of Petitioner's incarceration, habeas

relief is unavailable." Recognizing the observation in Woodall that the precise meaning of execution of sentence is hazy, it has been similarly held that to "the extent that a prisoner challenges his conditions of confinement, such claims must be raised by way of a civil rights action." Hairston v. Grondolsky, 2008 U.S. Dist. LEXIS 15912, 2008 WL 618805, *2 (D. N.J. March 3, 2008).

A petition is valid if it attacks the way a sentence is "put into effect" or "carr[ied] out." Woodall, 432 F.3d at 241. In Woodall, petitioner challenged a BOP regulation that capped his end-of-sentence time in a halfway house at ten percent of his total sentence (there, eleven weeks); the judgment had specified that the petitioner would spend sex months in such a facility. The Court observed that "carrying out a sentence in an ordinary penal institution, and therefore concluded that Woodall's petition crosses the line beyond a challenge to, for example, a garden variety prison transfer." 432 F.2d at 243. That qualitive difference was sufficient to mark Woodall's challenge as one that went to the execution of his sentence, and that was thus cognizable under §2241. Id. In the case at bar, as set forth below Petitioner's judgment was "put into effect" and "carried out" without authority of the Constitution or laws of the United States.

First, Petitioner is illegally confined by the BOP of his liberty without due process of law, because his sentence exceeded the punishment authorized by Congress. See Jones v. Thomas, 491 U.S. 376, 383 (1989); and United States v. DiFrancesco, 449 U.S. 117, 139 (1980) ("[A] defendant may not recieve a greater sentence than the legislature has authorised."); United States v. Bushert, 997 F.2d 1343, 1350 n.18 (11th Cir. 1993) ("It is both axiomatic and jurisdictional that a court of the United States may not impose a penalty for a crime beyond that which is authorised by statute"). The Seventh Circuit has gone so far as to apply the savings clause to claims based on erroneous guideline calculations, at least for those defendants sentenced during the pre-Booker mandatory regime. See Brown v. Caraway, 719 F.3d 583, 588 (7th Cir. 2013). Under the pre-Booker mandatory sentencing regime, the top of the guidelines

range provided the relevant maximum sentence. Because the guidelines were the practical equivalent of a statue.

In sum, when considering the validity of Massaro's indictment with the new Constitutional and statutory claims stated herein. The scope of the trial court's jurisdiction to sentence Massaro is constrained by his indictment, and the new Constitutional and Statutory rules. That said, the BOP is not at liberty to substitute Massaro's range of punishment authorized by Congress. It is legislative responsibility not an adminstrative duty of the BOP. Thus, Massaro is illegally confined without due process of law, under a void judgment and in violation of the Constitution and the laws of the United States.

(vi) Alleyne Invalidates Massaro's Life Sentence In This Case

Of particular relvance here, there simply can be no mandatory sentence of life under the uncharged/unproven 18 U.S.C. § 1111 (first-degree murder) statute without valid statutory authorization. Two reasons support this, first an unconstitutional statute is ineffective for any purpose and a Court does not have power to enforce a law which is nolonger vaild. See United States v. Booker, 543 U.S. 220 (2005)(Invalidating 18 U.S.C. § 3553(b)(1)). And, second Alleyne v. United States, 133 S. Ct. 2151 (2013), clarifies that first-degree and second-degree murder must be viewed as two separate and distinct crimes. See Alleyne, 133 S. Ct. at 2161 (Couching an at-law enhancement requirement predicated upon a particular fact as "a new, aggravated crime").

In sum, as set-forth below Massaro was sent to prison on first-degree murder charges which was never made and which he was never tried. "To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notion of due process". See Dunn v. United States, 442 U.S. 100, 106 (1979).

## I. THE FUNCTION OF THE RULE IN ALLEYNE DEFINES A SUBSTANTIVE RIGHT

The underlying Constitutional source of the rule is beside the point; this claim turns on the seemingly simple question of whether the rule itself has a "procedural function" or "substantive function". Looking to the function of the rule, it is clear that it concerns the accurate determination of guilt of a particular offense as well as the procedural obligations. If Apprendi was not clear on this point, Alleyne clarified it, 133 S. Ct. at 2160 (stating that "because the legally prescribed range is the penalty affixed to [a] crime," a fact that increases either end of the penalty range "produces a new penalty and constitutes an ingredient of the offense"). The core crime and aggravated crime, we know that they are not the same offense but instead constitute two different offenses because the statute provide for different statutory ranges of punishment.

The function of the rule defines the contours of the defendant's substantive right to "fair notice" implicated by the Due Process Clause. One of the constitutional provisions guiding the Court in its analysis in Alleyne was that aggravated the range to be defined as mere "sentencing factors" and introduced to the proceedings subsequent to the conviction. See McMillian v. Pennsylvania, 477 U.S. 79 (9186). By defining such facts as part of the substantive offense, the rule compels that the law must provide "fair notice" of any fact (or set of facts) that will ultimately constrain the sentencer's discretion, "regardless of what sentence the defendant might have recieved had a different range been applicable." Alleyne, 133 S. Ct. at 2161.

To be sure, Alleyne appropriately discusses the rights protected in terms of the Sixth Amendment right to trial "by an impartial jury," as this is how the question presented in that case was framed. Id. at 2156; Cf. United States v. Booker, 543 U.S. 220 (2005) (Explaining that it is appropriate for the Court to state the rule in terms of the question presented in a particular case where the Government wrongly sought to limit the scope of the constitutional holding). However, Alleyne explicitly states that the rule itself functions to "enable [] the defendant to predict the legally

applicable penalty from the face of the indictment," as well as to protect the jury trial right. Id. at 2161. Thus, despite the procedural underpining, the substantive ramification of the rule must not be overlooked, as "some rules may have both procedural and substantive ramifications." Montgomery v. Louisiana, 136 S. Ct. 718, 735 (2016).

In sum, because the rule defines "facts that aggravate a mandatory statutory minimum to be part of the substantive offense," the Due Process Clause insist the statute provide "fair notice" of the legally applicable minimum sentence, and the facts essential to triggering it. See Alleyne, 133 S. Ct. at 2161. Thus, the rule defines the substantive right to "ex ante notice" guaranteed by the Due Process Clause, and should be retroactively applied where this function of the rule controls the outcome of the case on collateral review. Welch v. United States, 136 S. Ct. 2557, 2168 (2016) (Laws that fail to comport with due process are void and may not authorize any penalty).

II. WHETHER THE RULE APPLIES RETROACTIVELY DEPENDS ON WHETHER IT HAS A PROCEDURAL OR SUBSTANTIVE FUNCTION IN THAT CASE

Petitioner recognize that every circuit court to address the issue of Alleyne's retroactivity has concluded that the rule is merely procedural which is subject to Teague's general bar to retroactivity.[1] However, each of these decisions pre-date the Supreme Court's more expansive readings of Teague in Montgomery and Welch. Of course, where a United States Supreme Court ruling effectively modifies and/or clarifies an earlier ruling of a Court of Appeals, a District Court and Appellate Court is obviously required to follow the commands of the Supreme Court. See e.g., Miller v. Gammie, 335 F. 3d 889, 900 (9th Cir. 2003)(en banc).

The Supreme Court "has determined whether a new rule is substantive or procedural by considering the function of the rule", that is, the actual effect of the rule when applied in criminal cases. Welch, 136 S. Ct. at 1265. "A rule is substantive rather than procedural," the Court explained in Welch, "if it alters the range of conduct or

1]. Teague v. Lane, 489 U.S. 288 (1989).

the class of persons that the law punishes." Id. at 1264-1265. Thus, substantive rules include constitutional rules forbidding criminal punishment for certain primary conduct, e.g., Montgomery, supra. Statutory interpretation decisions holding that a criminal offense does not reach certain primary conduct, and decisions voiding for vagueness a statutory provision defining a criminal offense or punishment. See Welch, 136 S. Ct. at 1265. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convcited of 'an act that the law does not make criminal" or faces a more severe range of punishment than the law authorizes. In contrast, procedural rules regulate the manner of determining either guilt or punishment, but do not shield a defendant from criminal liability or from exposure to a particular sentencing range. Welch, 136 S. Ct. 1265.

In sum, the retroactivity question in this case depends on the "function" of the rule that Petitioner seeks: whether, in practical operation, the rule would "alter [] the range of conduct or class of persons that the law punishes" or instead regulate only the "manner of determining" an appropriate sentence. Welch, 136 S. Ct. at 1264-1265. Here, it is clear that Petitioner faces a more severe range of punishment than the authorizes.

Thus, Petitioner asserts that Montgomery and Welch have changed the landscape by clarifying and extending the reach of Teague. Thus, for the following (2) reasons, this Court should reconsider its previous position on Alleyne's retroactivity in light of Montgomery and Welch. Before starting, one clarification is needed. The Supreme Court's jurisprudence stated herein about retroactivity generally is quite different from the stricter, statutory retroactivity requirements in 28 U.S.C. § 2255(h), which governs second or successive § 2255 motions. To qualify as a retroactive "new rule of constitutional law" under § 2255(h), "the Supreme Court itself must make the rule retroactive." While this is true, the retroactivity issue here is not about a second or successive motion under § 2255(h).

(1) Montgomery Clarifies That A Single Rule May Contain Both Procedural And Substantive Components, And Both Must Be Given Due Consideration

In Montgomery, supra., the Supreme Court held that its prior decision in Miller v. Alabama, 132 S. Ct. 2455 (2012), announced a new substantive rule of constitutional law that is retroactive to cases on collateral review. Four months later the Court decided Welch, supra., holding another prior decision, this time Johnson v. United States, 135 S. Ct. 2557 (2015), announced a new substantive rule to be retroactively applied.

The supreme Court clarified that the Teague framework recognized a new rule of constitutional law may have a procedural component, as well as a substantive one. "There are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within a category of persons whom the law may no longer punish." Montgomery, 136 S. Ct. at 734-35. Though this is not a new concept, whether Courts recognized and apply from one rule these procedural/substantive aspect is a nuance that had not been clearly elucidated. Id. (Demonstrating the State of Louisiana focused solely on procedural aspects and failed to give substantive components of Miller proper effect). Thus, Montgomery clarifies that some constitutional rules may not be neatly categorized as either substantive or procedural.

For instance, Miller presented the question of whether the State may convict a juvenile offender of first-degree murder. It concerned only the adequacy of the State's sentencing procedure. It "does not categorically bar a penalty for a class offenders or type of crime ... it mandates only that a sentencer follow a certain process." Miller, 132 S. Ct. at 2471.

Nonetheless, the Montgomery Court found that Miller had a "substantive function due to its effect." See Montgomery v. Louisiana, 136 S. Ct. at 735 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eight Amendment for a child whose crime reflects 'unfortunate yet transient immaturity'"). The procedure mandated by Miller

operates to identify persons whom enjoy a substantive right (juveniles whose crimes reflect the transience of youth) and whom, therefore, the Constitution protects against a certain penalty (disproportiante punishment). Id. Thus, although the Supreme Court announced in Miller a new constitutional rule that decided a procedural question, Montgomery shows that this procedural underpinning does not end the analysis. The rule may nonetheless contain a substantive component which requires retroactive application. Id.

Similarly, in addition to the procedural component, the Alleyne rule contains a substantive component that must be given due consideration. In Alleyne, the Court announced this new rule required by the Sixth Amendment, **"in conjuction with the Due Process Clause"**: "When a finding of facts alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." Alleyne, 133 S. Ct. at 2156, 2162. As in Miller, the procedural ramification "does not replace but rather gives effect to" the substantive component. Montgomery, 136 S. Ct. at 735.

In light of Montgomery, Alleyne is even more compelling than Miller, as it explicitly states that the rule has multiple ramifications. "Defining facts that increase a mandatory statutory minimum to be part of the substantive offense [1] enables the defendant to predict the legally applicable penalty from the face of the indictment. It also [2] preserves the historic role of the jury as an intermediary between the State and criminal defendants." Alleyne, 133 S. Ct. at 2161. Although the rights protected by these two components of the rule arise from different constitutional sources, Montgomery instructs that a Court must consider each of the separate functions when determining whether there is a substantive component that "controls the outcome of the case," and, thus, must be retroactively applied on collateral review. Montgomery, 136 S. Ct. at 736 (Explaining that, while Miller's holding has a procedural component," it also "announced a substantive rule of constitutional law").

The latter mentioned component has had an immediate and uniform effect on which facts must be proved to the jury in accord with the Sixth Amendment. It is now clear, for instance, that where the aggravated crime is fully charged but the jury fails to find a fact essential to the aggravated range of punishment, then the rule has been violated. See Alleyne, 133 S. Ct. at 2162 (Statutory facts which aggravate the penalty "must be submitted to the jury and proved beyond a reasonable doubt"). Any aggravated penalty imposed, i.e., any aggravated range of punishment to which the defendant is made subject, without the jury making this critical finding contr-avenes the defendant's Sixth Amendment right to trial by an impartial jury. Id.

Isolating this "reasonable doubt" component, Appellate Courts have clearly characterized the rule as procedural and subject to the Teague bar, as this component concerns only the identity of the factfinder and the burden of proof. See e.g., Jones v. United States, 526 U.S. 227, 243 n.6 (1999). However, in Montgomery the Supreme Court has clarified that a constitutional rule need not "concern the identity of the elements defining criminal liability" in order to be substantive, Cf. Jones, ibid., but, rather, can prohibit a prescribed penalty for a class of defendants who enjoy a substantive right. Notably, every circuit court to address the issue of Alleyne's retroactivity prior to Montgomery have applied Teague only to the extent that concerns "the elements defining criminal liability." See e.g., Walker v. United States, 810 F.3d 568, 573-74 (8th Cir. 2016)(Recounting circuit decisions, each of which recites and analysis only "reasonable doubt" component, then decides against retroactivity). To date, Petitioner is unaware of any court of appeals that has considered whether failure of the jury to find the aggravating fact renders imposition of the aggravating penalty without authority of substantive law. Thus, this particular component bears reconsideration.

More importantly, the first mentioned component has gone largely overlooked. But see, Crayton v. United States, 799 F.3d 623, 627 (7th Cir. 2015)(Performing a "watershed" analysis of both components and elucidating the view that Alleyne

conerns the "accurate determination of guilt of a partcular offense" as well as the procedural obligations)(William, J., concurring); and United States v. Lewis, 766 F.3d 255, 272 (3rd Cir. 2014)(Rendell, J., dissenting). And yet, even where the jury finds a fact that authorizes an aggravated penalty, but that penalty is not evident "from the face of the indictment," the rule has nonetheless been violated. See Alleyne, 133 S. Ct. at 2161. In such a case, the jury has unavoidably convicted the defendant of a substantive "crime" more serious than the one charged. Id. at 2161. It should go without saying that such a conviction violates Due Process and must be set aside. See United States v. Miller, 471 U.S. 130, 143 ("A Court can not permit a defendant to be tried on charges that are not made in the indictment against him") (quoting United States v. Stirone, 361 U.S. 212, 217 (1969)). Thus, the rule functions in conjunction with the Due Process Clause." Alleyne, 133 S. Ct. at 2156.

In sum, to sentence a defendant for a crime more serious than the one for which he is duly convicted necessarily results in a substantive error. Indeed, "the use of flawless sentencing procedures [could not] legitimate punishment" imposed under and unlawful conviction. Montgomery, 136 S. Ct. at 730. It follows that a violation of this particular component has an inevitable substantive effect which must be considered and applied on collateral review.

(b) WELCH CLARIFIES THAT THE TEAGUE ANALYSIS TURNS ON "THE FUNCTION OF THE RULE, NOT THE UNDERLYING CONSTITUTIONAL SOURCE"

Welch explains that the Teague framework is balanced by the need for finality on the one hand, and "the countervailing imperative to ensure that criminal punishment is imposed **only when authorized by law**," on the other hand, Welch, 136 S. Ct. at 1266 (emphasis added). This balance turns on whether the new rule itself has a "procedural function or a substantive function, that is whether it alters only the procedures used to obtain the conviction, or alters instead the range of conduct or class of persons that the law punishes." Id. The "underlying constitutional source" is beside the point. Ibid.

For example, the new rule announced in Johnson is that a law is unconstitutionally vague where it "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case' and to judge whether that abstraction presents a serious potential risk" of some result. Johnson, 135 S. Ct. at 2556. Johnson reaffirmed that vagueness "principles apply not only to statutes defining elements of a crime, but also to statutes fixing sentences." Id. at 2257 (citing United States v. Batchelder, 442 U.S. 114, 123 (1979)). The Johnson Court found that the indeterminancy of the "residual clause" of the Armed Career Criminal Act (ACCA) failed to provide "fair notice" of the conduct it punishes and invited arbitrary enforcement, thus, denying defendants Due Process of Law. Id. ("[I]mposing an increased sentence under residual clause...violates the Constitution's guarantee of Due Process").

Applying the Teague framework, Welch held this new rule to be substantive. See Welch, 136 S. Ct. at 1265. In doing so, the Court looked to "the function of the rule" and found that the Johnson rule "affected the reach of the underlying statute, rather than the judicial procedures by which the statute is applied," by rendering the "residual clause" impermissibly vague. Id. In other words, the Johnson rule functions to protect the defendant's substantive right to notice, ex ante, guaranteed by the Due Process Clause. Although the rule neither upsets the conviction for the underlying crime, nor prohibits Congress from properly rewriting the statute to punish the same conduct, the "residual clause" as prescribed fails to comport with the substantive "notice" requirements of the Due Process Clause, and sentences enhanced thereby have been imposed **without authority of law.** Id. at 1268 ("[A] court lacks the power to exact a penalty that has not been authorized by any valid criminal statute").

Looking to "the function of the rule," Alleyne clearly announced a new substantive rule of constitutional law. In Alleyne, the Supreme Court for the first time was required to answer "[t]he question of how to define a crime" in constitutional terms. See Alleyne, 133 S. Ct. at 2156. Of course, it is axiomatic that all

crimes are defined by statute. United States v. Hudson & Goodwin, 11 U.S. (7 Cranch) (1812). Still, the United States Constitution places limits on Congress as to how (and which) conduct may be proscribed and penalties may be imposed. The contours of these limits are progressively being delineated. See e.g., Johnson and Miller, supra.

As relevant here, there remained an open question as to whether the Constitution places any constraints on the authority of Congress when defining statutory facts. To be sure, the Court has consistently held as a procedural matter that due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970). Until Alleyne, however, the Court left open the substantive question of "whether , or when, the Constitution requires the government to treat a particular fact as an element, i.e., as a 'fact necessary to constitute the crime,' **even where the crime-defining statute does not do so.**" See Almenderez-Torres v. United States, 523 U.S. 224, 239-40 (1998)(quoting Winship) (emphasis added).

After considering the "historic link between crime and punishment," the Alleyne Court concluded that the Constitution compels this definition of a "crime": "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense." Alleyne, 133 S. Ct. at 2162. This new rule goes well beyond regulating standards of proof or sentencing procedures. Accordingly, for the following ( ) reasons, this Court should reconsider its previous position on Alleyne in light of Welch, and find the rule retroactively applicable on collateral review in this case:

(i) The Alleyne Rule Defines A Substantive Right

First, like Johnson, the Alleyne rule defines the contours of the defendant's substantive right to "fair notice" implicated by the Due Process Clause. As stated

above and made clear below, the Due Process Clause entitles defendants "to know, ex ante, the contours of the penalty that the legislature affixed to the crime."

The vagueness doctrine concerns the **"substantive** requirement that the law must give clear notice of the conduct that it prohibits and the consequences that attach to a violation". United States v. Hurlburt, No. 14-36611 (7th Cir. Aug. 29, 2016)(emphasis added)(citing United States v. Pawlak, 822 F.3d 902, 909 (6th Cir. 2016)(Discussing difference between "adversarial notice" and "ex ante notice").

The Alleyne decision concludes that "[d]efining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty **from the face of the indictment."** One way the rule does this is by clarifying that the " legally prescrided **range"**---not merely the maximum sentence---**"is the penalty** affixed to the crime," thereby extending the "ex ante notice" requirement to the legally prescribed **minimum.** See Alleyne, 133 S. Ct. at 2160 ("It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime"). Thus, both the floor and ceiling of the sentencing range defines the legally prescribed penalty. Until Alleyne, courts generally held the requirement satisfied where the defendant received "notice" solely of the maximum term of imprisonment. See e.g., Harris v. United States, 536 U.S. 545, 561 (2002). Alleyne acknowledges "the obvious truth that the floor of a mandatory range is as relevant to wrongdoers as the ceiling," and proceeds to assign the floor of the range constitutional significance. Alleyne, 133 S. Ct. at 2161 (Overruling Harris, supra.).

Also, by defining facts which aggravate the legally applicable range as "elements" of a **"new substantive offense,"** the function of the rule extends the right to ex ante notice to encompass additional facts, i.e., every fact essential to the range of punishment that the law places within the sentencer's discretion to impose, "even where the crime-defining statute does not" explicitly identify these as elements. Accord Almenderez-Torres, supra. Pre- Alleyne jurisprudence did not recognize the

constitutional significance of such facts, but rather, allowed prescribed facts which aggravate the range to be defined as mere "sentencing factors" and introduced to the proceedings subsequent to the conviction. McMillan, supra. Thus, by defining such facts as part of the substantive offense, the Alleyne rule compels that the law must provide "fair notice" of any fact (or set of facts) that will ultimately constrain the sentencer's discretion. Alleyne, 133 S. Ct. at 2161. The Eighth Circuit recognized this point in deciding one of the few cases involving an Alleyne violation where a defendant was sentenced for a crime that was neither alleged in the indictment nor submitted to the petit jury. United States v. Lara-Ruiz, 721 F.3d 554 (8th Cir. 2013). That court examined the case from the perspective of sentencing error, and held correctly that the defendant there was prejudiced "because he was sentenced for a statutory crime different from that which the jury found him guilty." Id. at 558.

In this case, Petitioner was sent to prison on charges which was never made and on which he was never tried. This violates the basic guarantee of due process which has been repeatedly reaffirmed by the Supreme Court. See Dunn v. United States, 442 U.S. 1000, 106 (1979)("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process."); Jackson v. Virginia, 443 U.S. 307, 314 (1979)("It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process."); see also, Lambert v. Backwell, 387 F.3d 210, 246 (3rd Cir. 2004)("[A] defendant's due process rights are violated when his conviction is affirmed on an offense that he was not charged with and that was not presented to the jury or court that tried him.").

In sum, under the Fifth Amendment, a defendant has a "substantial right to be tried only on the charges presented in an indictment returned by a grand jury." See United States v. Miller, 471 U.S. 130, 140 (1985). An indictment that does not set out all of the essential elements of the offense is defective. Id. at 143 ("a

court cannot permit a defendant to be tried on charges that are not made in the indictment against him"). "The Fifth Amendment made the" right to indictment by grand jury "mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings." Smith v. United States, 360 U.S. 1, 9 (1959). Thus, because the instant indictment and the relevant statutes fail to comport with due process the judgment is void and without the authority of law.

(ii) The Substantive Right Defined By The Alleyne Rule Places A Constraint On Congress' Authority When Defining Penalties

The rule prohibits a legislature from defining away from the substantivve offense facts which aggravate the legally applicable range of punishment. See Alleyne, 133 S. Ct. at 2164 (Alleyne "persuasively explains why Harris and McMillian were wrong decided") (Sotomayor, J., concurring). Prior to Alleyne courts generally looked to the "statute's language, structure, subject matter, context, and history" to define whether Congress intended for facts to be "elements" of the substantive offense or merely "sentencing factors", and Congress' intent was considered dispositive. McMillian, 477 U.S. at 85("[T]he State Legislature's definition of the elments of the offense is usually dispositive"); See also United States v. Henderson, 105 F. Supp. 2nd 523, 529-30(S.D. WVA 2000)(Discussing the "various maxims of statutory construction to ascertain congressional intent").

After Alleyne, it is clear that the Constitution does not confer to Congress the authority to aggravate the range of punishment that is within the sentencer's discretion once the conviction is obtained, but rather, inextricably defines the substantive "crime" in terms of the legally prescribed penalty. As a result, where a legislature prescribes an aggravate range of punishment based upon the findings of a particular fact, the legislature has defined a new, substantive "crime", regardless of the fact's label or the legislative intent. Alleyne, 133 S. Ct. at 2160.

Accordingly, Alleyne's definition of what constitutes a "crime" calls into question any sentencing scheme in which the law defines a fact as not an "element" of the substantive offense then proceeds to prescribe an aggravated penalty based upon a finding of that fact. See e.g, Commonwealth v. Wolf, No. J-24-2016 (PA June 20, 2016)(Invalidating mandatory minimum sentencing statute in light of Alleyne).

**(iii) The Substantive Component Of The Alleyne Rule May Render The Sentencing Scheme Constitutionally Vague**

The Due Process Clause requires the invalidation of laws that are impermissibly vague. See FCC v. Fox TV Stations, Inc., 132 S. Ct. 2307, 2317 (2012). "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.' " Id. (Citing United States v. Williams, 553 U.S. 285, 304 (2008)).

To be sure, the Alleyne rule did not render any conduct non-criminal. However, as the Court made clear in Johnson, vagueness principles are not limited to statutes defining criminal liability, but apply also to statutes fixing sentences. See Johnson, 135 S. Ct. at 2556-57. Moreover, the legislature is obligated to provide "fair notice" not only of the conduct that is prescribed, but "the severity of the penalty" as well. See BMW OF North America, Inc. v. Gore, 517 U.S. 559, 574 (1996); see also Alleyne, 133 S. Ct. at 2160 (Common law practice "allowed those who violated the law to know, ex ante, the **contours of the penalty** that the legislature affixed to the crime")(empahasis added).

Where the law fails to provide "fair notice" of either the elements of the "crime" it seeks to punish or the severity of the penalty, the law is constitutionally vague. Furthermore, the law may be vague **as applied**, as well as by provision. See United States v. Booker, 543 U.S. 220, 320-21 (2005)(Opinion of Thomas, J., dissenting)(discussing when substantive constitutional doctrine v. severability doctrine analysis is appropriate, and the applicability of severance doctrine to

constitutionally vague provisions and applications). A court should limit applications of the statute to avoid vagueness issues. Id. Likewise, vague provisions of the statute should be severed where the remaining portions may continue to function as intended. Id. Otherwise, the entire statute is invalid. Id.

The substantive component of the Alleyne rule may render the sentencing scheme vague in two ways. First, where the law defines as not an "element" of the substantive offense a fact that aggravates the legally applicable penalty, the law fails to define the "elements" of the "crime" it seeks to punish. The law, thus, is in tension with Alleyne's rule by failing to provide "fair notice" of the elements of a new substantive, but aggravated, "crime".

Second, where the legislature prescribes a sentencing scheme which fails to define, ex ante, the range of punishment which the law places within the sentencer's discretion upon conviction of the prohibited conduct, the law fails to provide "fair notice" of the severity of the penalty. In either case, the law runs afoul of the substantive "notice" requirements compelled by Alleyne.

Therefore, whether by failing to define the "elements" of the "crime" sought to be punished or failing to define the severity of the penalty, the law is void-for-vagueness (by provisions or application) where it fails to "enable[] the defendant to predict the legally applicable penalty from the face of the indictment." Alleyne, 133 S. Ct. at 2160. Thus, any punishment imposed pursuant to a vague sentencing scheme has been imposed without authority of law, and in violation of Due Process.

### (iv) The Alleyne Rule May Render The United States Sentencing Guidelines Constitutionally Vague When Applied To The Substantive Crime

The inevitable thrust from the Alleyne rule is that there may be only one penalty authorized by law upon conviction of any one substantive "crime". See Alleyne, (the "legally prescribed range is the penalty," and, therefore, any fact that aggravates the range is an element of a new substantive offense). This "function of the rule" may render the United States Sentencing Guidelines ("Guidelines") vague when

applied to the substantive crime. For example, U.S. Sentencing Guidelines Manual § 2D1.1 governs the punishment for violations of 21 U.S.C. 846. However, the Guidelines provides that if a victim was killed under the circumstances that would constitute murder under 18 U.S.C. § 1111, the Sentencing Court must instead sentence the defendant under § 2A1.1, the guideline applicable for federal first-degree murder convictions. A substantive crime not charged, nor proven beyond a reasonable doubt.

The Guideline by definition do not create substantive crimes, but rather, are incorporated only after the conviction is obtained as part of the sentencing process. See 28 U.S.C. § 994(a)(Guidelines are "for use of a sentencing court in determining the sentence to be imposed in a criminal case"). The Guidelines assign to each substantive crime a corresponding "base offense Level" which yeilds a range of punishment that is more narrow than that of the statutory range, and, in some cases, lies outside of the prescribed statutory range. This "base offense level" may then be "enhanced" based on facts outlined only by the Guidelines which, in turn, aggravates the applicable Guidelines range. However, the sentencing scheme specifies these sentencing facts as not part of the substantive offense, and requires the sentencing court to make the findings. See 18 U.S.C. § 3553(a)(4): and see Booker, 543 U.S. at 246. Hence, the applicable Guidelines range is unknowable prior to the sentencing court's factual findings.

Nevertheless, in every federal prosecution the Guidelines must be correctly calculated, see 18 U.S.C. § 3553(a)(4), thereafter serving as the "framework for sentencing." Peugh v. United States, 133 S. Ct. 2072, 2083 (2013). However, in light of Alleyne's constitutional holding, the application of the Guidelines range may impermissably aggravate the substantive crime by introducting during the sentencing process facts which aggravate the legally applicable penalty. Thus, because the aggravated Guidelines range results from consideration of facts that are by definition not part of the substantive offense, application of the Guidelines range denies the defendant due

process, as the law fails to provide ex ante notice of the elements of the crime and the severity of penalty.

In Peugh, the Suprem Court made clear that the Guideline retain sufficient "binding legal effect" to trigger Ex Post Facto protection. Peugh, 133 S. Ct. at 2086. Of course, "[i]f the Guidelines are constraining enough to require compliance with the Ex Post Facto Clause, it follows that they are constraining enough to require compliance the Due Process Clause's prohibition against vague laws." See United States v. Hurlurt, 2016 U.S. App. Lexis 15963 (7th Cir. 2016). Indeed, the Supreme Court has recently affirmed that the Guidelines have enough legal force that an error affecting the Guidelines range presumably affects the defendant's substantial right on direct appeal, even where the sentence imposed lies within the correct Guidelines range. See Molina-Martinez v. United States, 136 S. Ct. 1338 (2016)(Recognizing under plain error review that guidelines error is presumed to affect defendant's substantial rights). The applicable Guideline range exerts constraining force against the sentencer's discretion to impose a sentence within the range prescribed by statute.

Therefore, where the statute provides for a certain range of punishment upon the establishment of certain "elements" which constitute the substantive offense, but the applicable Guidelines range renders the statutory minimum outside of the sentencer's discretion to impose, application of the Guidelines denies the defendant due process, such that the law fails to provide fair notice of the severity of the penalty as well as the elements of the crime that it seeks to punish. On the one hand, the statutory minimum is no longer legally available due to the constraining effect of the Guidelines --- a legal effect that undoubtly figures into the defendant's decision of whether to purse plea negotiations or proceed to trial. On the other hand, the law defines as not part of the substantive offense the facts which trigger this constraining effect, such that neither the defendant, counsel, nor the court may know, ex ante, what facts will

ultimately render the statutory minimum legally out of reach or to what degree the minimum will be aggravated. Indeed, as the above cited example illustrates, the legally applicable range after the Guidelines are applied may not be known until after conviction.

(v) Applying The Guidelines Rendered The Law Vague In This Case, And The Penalty Imposed Violates Due Process

The Federal Sentencing Guidelines constitute an overlay of binding law that limits discretion. See Sentencing Reform Act of 1984 (SRA), as amended, 18 U.S.C. § 3551 et seq., and 28 U.S.C. §§ 991-998, and have the force and effect of laws." See Mistretta v. United States, 488 U.S. 361, 413 (1989). The Guidelines "bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases." Id. at 391. See also Stinson v. United States, 508 U.S. 36, 42 (1993). The Sentencing Guidelines Manual" is authoritative unless it violates the Constitution or a Federal Statute." Id. at 38.

The Guidelines are not uniquely immune from constitutional constraints. To the contrary, the Supreme Court has repeatedly addressed and even sustainted constitutional challenges to them. See e.g. Peugh, supra., (application of advisory Guidelines violated Ex Post Facto Clause); United States v. Booker, 543 U.S. 220 (2005) (mandatory Guidelines violated Sixth Amendment); Wade v. United States, 504 U.S. 181, 185-86 (1992)(Government's refusal to file substantial-assistance motion under Guidelines was "subject to constitutional limitations"); Mistretta, 488 U.S. 361 (Guidelines did not violate Constitution's structural features). And it has recognized that even the Guidelines' commentary must yield where it "violates the Constitution." Stinson, 508 U.S. at 38, 45.

In Peugh, the Supreme Court held that the retrospective use of a harsher version of the advisory Guidelines "create[d] a sufficient risk of a higher sentence to constitute an ex post facto violation." 133 S. Ct. at 2084. This reasoning rested on the fact that the Guidelines "aim [] to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines." Id. at 2083. As the Court stated, those

measures are so powerful that "the Guidelines are in a real sense the basis for the sentence." Id. at 2083. Thus, the Court rejected the Government's principle argument "that there could be no constitutional violation because the advisory Guidelines were merely guideposts and lack[ed] sufficient legal effect to attain the status of a law within the meaning of the Ex Post Facto Clause." Id. at 2085-87. See also, Molina-Martinez, supra., (reaffirming that the Guidelines serve as the anchor. Focal point, and lodestar of sentencing, establish the essential framework of the proceeding, and have a "real and pervasive effect" on sentences). 136 S. Ct. 1338.

The very ex post facto violation recognized in Peugh is premised on the Guidelines being intelligable. If the Guidelines could be vague consonant with the Constitution, then it simply would not matter which version of the Guidelines manual the Sentencing Court used. It would make scant sense to insulate the Guidelines from the Constitution's fundamental prohibition on vagueness, but not its prohibition on ex post facto laws.

The Court has recognized as "undoubtly correct" that Ex Post Facto and Due Process Clause "safeguard common interests---in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws." Rogers v. Tennessee, 532 U.S. 451, 460 (2001); cf., Johnson, 135 S. Ct. at 2556(vagueness doctrine designed to ensure "fair notice" and prevent "arbitrary enforcement"); with Weaver v. Graham, 450 U.S. 24, 28-29 (1981) (ex post facto doctrine designed to "give fair warning" of legislative acts and prevent "arbitrary and potentiall vindictive legislation"). In Bouie v. City of Columbia, 378 U.S. 347 (1964), for example, the Court explained that judicial construction of a vague statute violates the Due Process Clause for the same reasons that retroactive legislation violated the Ex Post Facto Clause. Id. at 351-55, 362.

The dual concerns of fair notice and arbitrary enforcement underlying both clauses apply here no less than they did in Johnson, supra. The Guidelines as used in this case is a "judicial morass that defies systemic solution, a black hole of

confusion and uncertainty that frustrates any effort to impart some sense of order and direction." Johnson, 135 S. Ct. at 2562. This "standardless" and "shapeless" provision of "hopeless indeterminancy" does not afford fair notice. Id. at 2556, 2558, 2560.

The use of the Guideline can also invite arbitrary enforcement. See e.g., the commentary note 12 to U.S.S.G. § 2D1.1 ("types and quantity of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.1(a)(2)(relevant conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance"). And, the commentary to § 6A1.3 which states in relevant part that "[t]he Commission believes that use of a preponderance of the evidence standard is approriate to meet due process requirements and policy concerns in resolving disputes regarding application of the Guidelines to the facts of a case." Id. Using the Guidelines in this manner can allow a defendant be convicted and sentenced to an aggravated crime, even if charged only with the non-aggravated crime.

The Supreme Court's holdings today corrects this mistaken belief. See Alleyne, 133 S. Ct. at 2161 explaining, "it is obvious, for example, that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments prescribed for each crime are identical. One reason is that each crime has different elements and a defendant can be convicted only if the jury has found each element of the crime of conviction." Id. (emphasais added). See also Dunn v. United States, 442 U.S. 100, 106 (1979)([F]ew Constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused."). Thus, Petitioner in this case was denied due process because he convicted of an offense that he was not charged with and was not presented to the jury or Court that tried him. As a result of the application of the Guidelines used by the Court.

CLOSING STATEMENTS

The following is the closing statements of the overlaping issue(s) stated above, which would result in a miscarrige of justice if not heard.

It is a structuaral error to sentence and convict a defendant for crimes not charged in his indictment. This renders a criminal proceedings fundamentally unfair. The Supreme Court's rational in Gonzalez-Lopez, 548 U.S. at 149 (giving examples of structural error), dictates the outcome here. There the Court held that the violation of a defendant's Sixth Amendment right to counsel of choice was structural error. Id. at 150. In doing so, the Court observed that a different attorney might have pursued "different strategies with regard to investigation and discovery, development to the theory of defense, selection of jury, presentation of the witnesses, and style of witness examination any jury argument." Id. Further, the choice of attorney "affect[s] whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial." Id. Thus, "[i]t is impossible to know to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings." Id.

so too when an indictment charges a lesser crime than the one for which a defendant is eventually sentenced. Assessing the effects of the flawed indictment here is "speculative inquiry into what might have occurred in the an alternate universe" and is a far cry from the "quantitive [] assess[ment] in the context of other evidence presented" that defines harmless-error analysis. Id. at 148, 150. Also compare, United States v. Gonzalez, 420 F.3d 111, 131 (2nd Cir. 2005), stating:

> "Indeed, justice would hardly be well served by a rule that delayed the identification of one or more elements of a crime until sentencing. Prosecutors, who must draft indictments and develop evidence to meet their burden of proof; defendants and their counsel, who must decide whether to challenge the sufficiency of the Government's case or pursue plea negotiations; and trial judges, who must rule on the relevancy and sufficiency of evidence, prepare jury instructions, and ensure the factual bases for guilty pleas, all need to know long before sentencing which facts must be proved to a jury and which ones can be reversed for resolution by the sentencing judge." Id.

Massaro pose no danger and can have a smooth transistion back into society; if his petition is granted. Although the district court was prohibited from considering Massaro's post-conviction rehabilitation at his 1993 sentence, the Supreme Court has since held that such evidence may be "highly relevant to several of the factors listed in 18 U.S.C. § 3553(a), such as the need for deterrence, incapacitation, and the provision of educational or vocational training or other correctional treatment. See Pepper v. United States, 131 S. Ct. 1229, 1242 (2011). If Massaro had appeared for resentencing after Pepper, the Court likely would have taken into consideration Massaro's exemplary custodial record, work history, and educational pursuits as reason to impose a below guideline sentence. Furthermore, if resentenced today new laws support that Massaro is currently serving a federal sentence that would be substantially lower if he was convicted of the same crime today. These facts were not considered by the BOP.

Nor did the BOP consider, the 2013-14 Justice Department Data and Statistics that shows federal prisoners released as part of the Federal Bureau of Prisons "Compassionate Release Program": for inmates 50 and over is that 3.5% commit crimes compared to 41% for those inmates under the age of 50. Furthermore, inmates over 60 years of age released from prison recidivism rates go down to 1.7%. These statistics show that Massaro can have a smooth transistion back into society and become a law-abiding citizen if his petition is granted.

More Importantly, Massaro's Ex Post Facto claim stated above and the intervening changes in the law established that Massaro is actually innocent of the act for which he received an enhanced sentence, he has already served more time in prison than the law authorized.

Finally, the BOP's decision only considered the severity of the crime, a fact already considered at the time of sentencing. Contrary to Congress' specific intent and the Compassionate Release Regulations the BOP gave no consideration to the follow-

ing: (1) Justice Department Statistics; (2) Intervening Change in the Law; and (3) Post-Conviction Rehabilitation.

Respectfully Submitted,

Joseph Massaro, pro-se

ATTACHMENTS

15 pgs.

Joe MASSARO
# 83413-020
PO BX 1000
Lewisburg, PA 17837

TO: WARDEN Thomas
2400 Robert Miller drive

RE: Federal Bureau of Prisons MEMO# 5050.49; Compassionate Release/Reduction of Sentence

Joe MASSARO
83413-020

1 of 15 pgs

Dear WARDEN,

Greetings, I pray All is well w/you. AS per OUR Convesation; i was incarcerated in June 22, 1992.

I have Served 21 yrs Since then between USP Leavenworth & USP Lewisburg. Born 8/25/43 & Am now 70 yrs. Old. In All these yrs i have managed to maintain a clean record, & have not been written up for violating any B.O.P. rules. I beleive my record of good behavior (under penitentiary Conditions) Propels me to be Considered & Selected to participate in this Compassionate release/Reduction in Sentence Program (R.I.S.)

Prior to my Arrest i was blessed w/10 Children. I now have 23 grandChildren & 6 great grandChildren. My wife &I of 25 yrs (deceased) raised Seven of our 10

2

I Am asking You + The examining board here At Lewisburg For a recomendation For a R.I.S. or even house Arrest. Just one more chance. Of course to be decided by the Courts. Your recomendation will go Along way.

Coming to prison was the "Best Thing That EVER Happened to ME."
Nothing or no-one could have convinced me that my life was a wayward one.
Given time to Think, I Am now Fully convinced + Lament "GREATly" over The wrong that i have done. The lives i have disrupted + the pain That "i" brought upon my Victims, Their Families + my very own loved ones. I blame no-one, i was Cognitive + wrong Thinking. Greedy, Selfish, + inconsiderate. LORD Forgive me. Though violent at one time, now Violence free, under The worst of Circumstan-

IN These years I've suffered greatly. I've lost 21 blood relatives, 10 friends, 5 Aunts, 4 uncles, 4 cousins, my Mother in law, daughter in law, my Mom, sister + my Son John that committed Suicide at the Age of 38. All these (mom, sis, son) passed within 30 mths. Then my wife Florence of 25 yrs. died a horribly painful death from brain cancer.

The emotional pain i endured not being there for her, to comfort + give her strength is unexplainable. My poor Children had to go through this themselves, w/out my Support in the last days of her pain + agony. Not being there for them was heart breaking + still is. Not being Able to mourn w/them nor Share their sorrow plagues me day after day. That is why nothing in this world could tempt me to jeopardize

4

my freedom preventing me from being w/them in their time of need "EVER AGAIN." My family needs me, we have all suffered + i apeal to your mercy.

Now i will try to convince you that i am a viable candidate for a R.I.S. That i meet all the requirements + that you can feel safe re-comending me as a candidate for this program w/confidence. +

5

I bring your attention to BOP Memo 5050.49.

Pg 1, + it States; (see Apendix)
Purpose + Scope; "the bureau uses 18 USC 4205 (g) + 18 USC 3582 (c) (1) (A)
in particulary extraordinary Circumstances which "Could Not" reasonably been forseen by the Ct At The time of Sentencing."

Pg 4 C- Other elderly inmates: "inmates 65 or Older who have Served 10 yrs. or "75%" of the term of imprisonment to which inmate was Sentenced.
(also qualify for consideration)
I'd like to discuss these 2 items before i go onto

Pg 10 - Article 7: "Factors + Evaluations of Circumstances in REQuests"
When i Stood before the Judge i was a Convicted Felon, vile in the eyes of Society + the Law. Although i was offered a 10yr. plea i Chose to go to trial. The plea was particularly offensive to me. The govt. wanted

indictment, the Luchese Crime Family OF which i Am not! My reply was, "i Am not in the Mafia + i won't say that i Am - would you say that you are a member of the KKK?" Ergo i Am in prison 11 yrs. longer than i needed to be. MERCY.

There is no way the Judge could have seen or invisioned the Change that has taken place in me. OR that i Am a completely different person.

I was 48 when i was Arrested, 50 when Sentenced, i was deep in my Sin. I'm Still A Sinner w/out A doubt. InFact i don't Think Anyone could withstand a 360° examination + be found Sinless. w/that in mind;

ON 3/26/2013 i Completed the Academic requirements in my ministerial Studies program At Global Univ. For A "Certified Minister" I've maintained An "A" Avg.

7

I Am curently enrolled in phase II "licenced Minister"
Global university is the Academic Arm of the
Assembles or GOD Ministries. (see Apendix). Since my incar-
ciration
The Lord has used me to witness many Souls to Christ.
Prisoners, Friends, + my own Family. To me that was
Such an annointing + every one a miracle.

In conjuction w/my courses I've taken Lewisburg's
Anger managment Class, + Drug Class — only to be of help
to my ministry. As these problems seem to be the most
trying to those of GODS Flock that i corespond with. I
Found them to be of great help to me. (see Apendix)

The main issue seemed to be for you + the
exmainers the requirement of being imprisoned for
30 yrs. "At least." Let me bring you back to pg 4 C,
"Other elderly Prisoners" requiring (Clearly) 75% of Sent-

Life expectancy when i was born in 1943 for a male child was 60.8 yrs. My expectancy at time of sentencing was 78.8 yrs. OR 28.8 more yrs. for a 50 yr. old male. (See Apendix World Almanac) According to These Stats i only have 7.8 yrs. to live or to meet That 78.8. Surely enough to meet the 75% Requirement of the B.O.P. & deserving Consideration. At age 50 + 28.8 = 78.8
28.8 x 75% = 21.6.
At this writing i have 21.4 completed Since my Arrest in June of 1997.

I believe that w/my record & the goals i have achieved, coupled w/the tremendous Change in my life. That my Request for a R.I.S. deserves an indept look w/a high possibilty that my apeal for Mercy shall be granted.

I'd like to bring your Attention to

pg. 10 Sec 7 OF B.O.P. Memo:
Sec. 7 " FACTORS + EVALUATION OF CIRCUMSTANCE IN R.I.S. REQUESTS"

1) NATURE + CIRCUMSTANCES OF OFFENSE -
2) Criminal history -
3) Comments from Victims - ?
4) Unresolved detainers - N/A
5) Supervised release Violations - N/A
6) Institutional Adjustment - FAVORABLE
7) Disciplinary INFRACTIONS - NONE
8) Personal History from P.S.R. -
9) length of Sentence etc. - FAVORABLE 21 + yrs.
10) Current Age - 70.2
11) See pg. 10
12). Whether release would minimize the Severity of Offense - given the heartaches, + Change in me, time Served, NO! There are plenty of CASES exhibiting disparity of Sentence.

At the end of the day, this review board is most concerned whether or not the inmates release would pose a danger to the Safety of Any other person or the Community. To be discussed.

Release Plan; Employment, Medical, Financial 10

Immediately upon release i intend to marry my Fiancée of 11yrs. Jeannette Serafini a widow, Jeannette & i met through the Liebermans very Close Friends From our Church, & have been in Love For over 10yrs. Jeannette is a Farm girl & a Christian all her life. Widowed 14yrs. ago. If necessary we will get married before my release To insure my residence at her Farm in Coudersport, PA.

I have contracted my Social Security office & They have estimated my benefits to be $2000.00 mth. It may be more for 2 of us. I Also have rental property in Massapequa, L.I. N.Y. which After TAXES, maintenance, ins. leaves me $1000.00 mth. So my net income will be $3000.00 A month plus. Jeannette Farm is Morgage Free. More than enough for a retired Couple.

We do plan to do Some Farming & to Continue

in ministry together. I expect to go onto level 3 in my ministerial studies + be ordained. For sure I'll be licenced by then + able to marry Christian couples. I will be very active in church ministry + do all i can to minister troubled youths, adults, or anyone in need. Hoping to discurage them of any illegal activity in the hopes that they stay out of Jail.

There has to be a voice out there that debunks the culture media depicts of prison. People have to realize the injury they impose on their loved ones once they are abandoned. Understand that their actions have adversley affected the lives of their victims + their families. They have to be made aware of the effect they are having to all that is touched by their actions + all the hurt they've caused.

They have to realize there is no glory in being a Felon. A Monical they will have to carry for the rest of their lives. Hurting their chances of employment, & maybe even losing out on the person they'd like to marry because of family disaproval.

Most importantly i will be tireless in my efforts to put my family back together. To be a part in their lives, & to help them anyway i can.

Medically i am sound, & eligable for Medicare/Medicaid. If need be i can always earn a small income working for my friends the Liebermans. They have a large Cosmetic Co. in Couldersport & employ over 100 people, plus "many" real estate holdings. ~~In fact Jeannette, though 72, still works there 3 dys. a wk.~~

13

The elephant in the room is daunting: How can this Commitee be Sure that i would not be a danger to The Community.

First off i'd like to Say i am deeply ashamed + remorsefull of The life of crime i lived. I take Full responsibility for my Actions - There is no excuse, "I WAS WRONG" + hurt others. The ripple effect of The harm i caused haunts me everynight. The real pain comes in realizing that my family, + The Victims Family are going Through The Same bad Memories for 21 yrs along w/me. I will "NEVER" do that again.

This last 21 yrs. have afforded me The opportunity w/ The help of GOD, to have changed my life + Thought Process. The losses i endured are Legion. My Faith is my foundation + w/GODS help All Things Are

Given the Chance i will live each day in Appreciation of the opportunity this board has Afforded me. Everyone deserves a Second Chance i pray that you find me worthy. BOP State Show that Violent prisoners Are at the Low end of the Scale for refusal. Coupled w/the "FACT" that prisoners over 55 yrs. of Age have less than A 5% recidism rate. Prisoners older than that are in the 1% - 2% bracket.

If i am released i will be Accountable to All those people that have put Faith in me & took the time to pen letters of recomendations. Daunting is the fact that if granted a release it will be because of divine intervention & His Will for my life. I realize that if i fail the ones that come behind me

15.

Will be Judged by my infractions + possibly be denied, not being Allowed that "ONE MORE CHANCE" We All So imeaticly desire. That, Warden is A Very heavy burden. I Am tired of other people suffering for my Mistakes. It will happen no more!

Thank you for your time + consideration, i extend my Sincerest Gratitude for your patience in entertaining my request for A Reduction in Sentence.

Respectfully + Sincerly

Joe Mannaro

83413-020

# ADDENDOM

By current Standards & Constitutional Law; I have received an illegal Sentence. I believe if given the Chance, the courts will reconsider this wrong doing in the light of the current Laws in effect today.

Along with my Rehabilitation & the Change i have made in my life; the opportunity that this new Lattitude given to the Cts. to Sentence me from 0-Life, as so Stated in these new Laws enacted by Congress - lie heavily in my favor.

Thank You & GOD BLESS

# Apendix

1) BOP program Statement 5050.49 pgs 1,10
2) World Almanac;
   US INFANT mortality RAte 1960-2005
3) Global university certified minister + Letter
4) Medical Report
5) EDUCATION Report
*6) 20 letters of recomendation from family + friends
7) Letters From STAFF

* The letters from Mike & Tobby (Coscia) + their Children SUNI, Michele, Randi. Sorry but they misunderstood my request for a recomendation letter. I included them because they showed love & extended family interaction. MICHAEL COSCIA is 86 yrs. old + He & Tobby were the best man + maid of honor at my wedding to Florence.

U.S. Department of Justice
Federal Bureau of Prisons

PROGRAM STATEMENT

| | |
|---|---|
| OPI | OGC/LCI |
| NUMBER | 5050.49 |
| DATE | August 12, 2013 |

# Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)

/s/
*Approved*: Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

§571.60 Purpose and scope.

Under 18 U.S.C. 4205(g), a sentencing court, on motion of the Bureau of Prisons, may make an inmate with a minimum term sentence immediately eligible for parole by reducing the minimum term of the sentence to time served. Under 18 U.S.C. 3582(c)(1)(A), a sentencing court, on motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment of an inmate sentenced under the Comprehensive Crime Control Act of 1984.

The Bureau uses 18 U.S.C. 4205(g) and 18 U.S.C. 3582(c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.

For the purposes of this Program Statement, the terms "compassionate release" and "reduction in sentence" are used interchangeably.

In deciding whether to file a motion under either 18 U.S.C. 4205(g) or 18 U.S.C. 3582(c)(1)(A), the Bureau of Prisons (BOP) should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

Federal Regulations from 28 CFR are in this type.
Implementing information is in this type.

All RIS requests should be assessed using the factors outlined in Section 7.

4. REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – ELDERLY INMATES

The criteria for a RIS request may include the following:

a. **"New Law" Elderly Inmates.** Inmates sentenced for an offense that occurred on or after November 1, 1987 (e.g., "new law"), who are age 70 years or older and have served 30 years or more of their term of imprisonment.[1]

b. **Elderly Inmates with Medical Conditions.** Inmates who fit the following criteria:

- Age 65 and older.
- Suffer from chronic or serious medical conditions related to the aging process.
- Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
- Conventional treatment promises no substantial improvement to their mental or physical condition.
- Have served at least 50% of their sentence.

Additionally, for inmates in this category, the BOP should consider the following factors when evaluating the risk that an elderly inmate may reoffend:

- The age at which the inmate committed the current offense.
- Whether the inmate suffered from these medical conditions at the time the inmate committed the offense.
- Whether the inmate suffered from these medical conditions at the time of sentencing and whether the Presentence Investigation Report (PSR) mentions these conditions.

c. **Other Elderly Inmates.** Inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced.

Elderly inmates who were age 60 or older at the time they were sentenced ordinarily should not be considered for RIS if their current conviction is listed in the Categorization of Offenses Program Statement.

All RIS requests should be assessed using the factors outlined in Section 7.

---

[1] These criteria are different from those provided in 18 U.S.C 3582(c)(1)(a)(ii), which states that a court, upon motion of the BOP Director, may reduce a sentence term if it finds that "the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)."

Jack Ferranti
135 Fd 3rd 116 2nd Cir 1998

| | | |
|---|---|---|
| time credit | | |
| Time served up to date of sentencing | 14.4 | 1.2 |
| Sentence less good time credit and time served up to date of sentencing | 357 | 29.7 |
| Release before end of life expectancy | 15 | 1.3 |

This sentence would not constitute abuse of discretion or a violation of the *ex post facto* doctrine. *Gullett*, 75 F.3d at 951 n.10. A sentence close to a person's life expectancy may be imposed since it remains less severe than a life sentence. *Prevatte*, 66 F.3d at 847-848.

In light of the seriousness of the offense, which resulted in the death of a firefighter killed in the line of duty, the endangerment of the lives of the other firefighters as well as the lives of the tenants whose residences were located in the building, and other aggravating factors, defendant is sentenced to 435 months imprisonment at a base offense level of 42.

B. Conspiracy to Commit Arson



© 2013 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Joe Massaro 83413-020

Request For Re-Consideration

WARDEN Thomas,

Greetings Please read over my request for re-Consideration Carefully upon the denial of my RIS. motion.

WARDEN the main cruxt of my Appeal was not even mentioned or ruled on. Thus either missed, ignored, or mis-understood.

Clearly if we look at pg. 4 Article "C" of The memo tittled "Other elderly prisoners" I Am more than qualified, Satisfying every component required. The provisons state that if A prisoner is "65" or older, + has completed 10 yrs. of his Sentence, "OR" 75% of his intended incarciration, he Shall be considered for R.I.S.

WArden i Am 70.5 yrs old + have been in prison 21.6 yrs. I Ask what is the problem?

R.P.R. #2

I was sentenced to life, in 1994 (World Almanac) my life expectancy was 74.7 yrs. The Judge's intent considering "ALL" dependable knowledge available was for me to do 24.7 yrs. of my life incarcerated.

75% of 24.7 mo. is "18.5", I've already done 21, actualy 88% of my expected sentence to which the Judge intended me to serve.

Please re-consider my request in the light of my life expectancy. L/expec. is definately part of this Country's Juris Prudence, (please see accompanying case law) Thank you for your time & consideration.

Sincerely

[signature]

Apendix

Request For Re-Consideration 12/29/'13

1) Copy of Original Request to R.I.S. Committee
2) Copy - Refusal From RIS Committee
3) BOP program Statement 5050.49 pgs 1 & 4
4) Supporting legal decisions pertaining to Life Expec

U.S. Department of Justice

Federal Bureau of Prisons
United States Penitentiary

Lewisburg, Pennsylvania 17837

November 14, 2013

MEMORANDUM FOR J. E. THOMAS, WARDEN

FROM: S. Stover, Unit Manager

SUBJECT: MASSARO, Joseph Reg. No. 83413-020
Program Statement 5050.49, Request for Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582©(1)(A) and 4205(g)

On November 14, 2013, H Block Unit Team reviewed inmate Massaro's request for a Reduction in Sentence (RIS). Unit Team reviewed the request pursuant to the above Program Statement.

Upon initial review, it is the Unit Team's recommendation that inmate Massaro's RIS request be denied for the following reason(s):

X Does not meet eligibility or justification criteria:

Inmate Massaro is 70 years of age; however, he has not met the requirement of serving 30 or more years of his sentence. On July 26, 1994, Massaro was sentenced to LIFE; therefore, he will not be eligible for consideration as a "New Law" Elderly Inmate until July 25, 2024.

Comments for review staff:

CMC:

Concur; Has not served 30 years of sentence.

AWP:

Does not meet Criteria

RIS Coordinator:

concur — does not meet extraordinary/compelling nor non-medical/elderly criteria

Warden's Decision:

☒ AGREE - The inmate's request is denied for the above reason(s).

☐ DISAGREE - The inmate's request should not be denied at this time. The Unit Team should submit complete packet for RIS processing.

[signature]
J. E. Thomas, Warden

12-12-13
Date

Joe Massaro 83413-020

# Request For Re-Consideration

WARDEN Thomas,

Greetings. Please read over my request for re-consideration carefully upon the denial of my RIS. motion.

WARDEN the main cruxt of my Appeal was not even mentioned or ruled on. Thus either missed, ignored, or mis-understood.

Clearly if we look at pg. 4 Article "C" of The memo titled "Other elderly prisoners" I Am more than qualified, Satisfying every componet required. The provisons state that if A prisoner is "65" or older, + has completed 10 yrs. of his Sentence, "OR" 75% of his intended incarciration, he shall be considered for R.I.S.

WArden i Am 70.5 yrs old + have been in prison 21.6 yrs. I Ask what is the problem?

R.F.R. # 2

I was sentenced to life, in 1994 (World Almanac) my life expectancy was 74.7 yrs. The Judge's intent considering "ALL" dependable knowledge available was for me to do 24.7 yrs. of my life incarcerated.

75% of 24.7 mo. is "18.5", I've already done 21, actualy 88% of my expected sentence to which the Judge intended me to serve.

Please re-consider my request in the light of my life expectancy. L/expec. is definitely part of this Country's Juris Prudence, (please see accompanying case law) Thank you for your time & consideration.

Sincerely

[signature]

# Apendix

## Request for Re-Consideration 12/29/13

1) Copy of Original Request to R.I.S. Committee
2) Copy - Refusal From RIS Committee
3) BOP program Statement 5050.49 pgs 1 & 4
4) Supporting legal decisions pertaining to Life Expec

**Inmate's Name: MASSARO, Joseph**
**Inmate's Reg. No.: 83413-020**
**Quarters: H-101L**

This is in response to your request for reconsideration for a reduction in sentenced pursuant to Program Statement 5050.49.

Program Statement 5050.49 states in Section 9, DENIAL OF REQUEST,

a. When an inmate's request is denied by the Warden, the inmate will receive written notice and a statement of reasons for the denial. **The inmate may appeal the denial through the Administrative Remedy Procedure.**

I trust the above mentioned information is responsive to your concerns.

01/17/2014
Date

S. Stover, Unit Manager

LEW 1330.16A
ADMINISTRATIVE REMEDY PROGRAM
ATTACHMENT A

INFORMAL RESOLUTION ATTEMPT # ¢ 02x4

In accordance with Program Statement 1330.16, Administrative Remedy Program, this form will serve as documentation by the respective staff member and his unit manager to indicate an informal attempt to resolve the complaint of the following inmate:

NAME: Mussoro Reg. No. 83413-080

FORM TO INMATE: 1-27-14 (Date) STAFF Zy-L (Name) 3 (Unit)

A BP-229(13) WILL NOT ORDINARILY BE ACCEPTED WITHOUT THIS COMPLETED FORM ATTACHED

---

1. Nature of Complaint (to be completed by inmate):

I Appeal my denial of my R.I.S. request (compassionate release) on the grounds of "Not meeting the requirements put forth in BOP. Prog. Statement 5050.49".

I feel ~~[illegible]~~ Commitee did not consider provisions for "Older prisoners" over 65, w/75% of their sentence served & completed 10 yrs of incarceration. As so stated in prog. stmt. Pg 4, Article C

LEW 1330.16A
ADMINISTRATIVE REMEDY PROGRAM
ATTACHMENT A CONTINUED

OR STAFF USE ONLY (to be completed within 5 working days)

. Date Received from Inmate: 1-28-14

. Staff Member Assigned to Respond by U/M: W. Zegl

Efforts Made to Resolve the Problem: Your request was reviewed in accordance with Program Statement 5050.49 Compassionate Release/Reduction in Sentence. At that time it was determined by the Warden that you are inappropriate for early release under P.S. 5050.49

Applicable Program Statement Used in this Informal Resolution Attempt: 5050.49 Compassionate Release/Reduction in Sentence

Inmate's Response to Informal Remedy Attempt: ______

pared by: W. Zegl

eived by (U/M): [signature]

ginal Returned to Inmate (Date): 2/4/14

Central File

Admin. Remedy No.: 768226-F1
Part B- Response

ADMINISTRATIVE REMEDY RESPONSE

This is in response to your Request for Administrative Remedy received February 14, 2014, wherein you request reconsideration for early release under Program Statement 5050.49, Compassionate Release/Reduction in Sentence (RIS), based on your age and number of years served.

A review of your current status reveals you were sentenced on July 26, 1994, to a Life term from the Southern District of New York for RICO Conspiracy, Murder in the Aid of Racketeering, Conspiracy to Commit Extortion, Conspiracy to make Extortionate Extensions of Credit and Conspiracy to Collect Extortionate Extensions of Credit through Extortion. Program Statement 5050.49, provides consideration for elderly inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced. Due to your age and number of years served you do not meet the criteria for early release consideration under Program Statement 5050.49. Finally, you requested RIS consideration on November 14, 2013. Your request was appropriately reviewed in accordance with Program Statement 5250.49 and denied by the Warden on December 12, 2013.

Based on the above information, your request for Administrative Remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, United States Federal Bureau of Prisons, Northeast Regional Office, United States Customs House - Seventh Floor, Second and Chestnut Streets, Philadelphia, PA 19106, within twenty (20) calendar days from the date of this response.

3/19/14
Date

J. E. Thomas, Warden

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Joe MASSARO — 83413-020 — H101 — Lew

LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

Part A- INMATE REQUEST Dear warden,

Please review my request for re-consideration concerning my denial for a Reduction in Sentence/Compassionate release. According to BOP policy # 5050.49, pg. 4 Article C. I more than qualify. There is a provision for; "prisoners over 65" - have served 10yrs. of sentence, or 75% ct ordered imprisionment.

Thank You

2/13/14

DATE

Joe Massaro

SIGNATURE OF REQUESTER

Part B- RESPONSE

RECEIVED

FEB 14 2014

RECEIVED

FEB 14 2014

ADMIN REMEDY CLERK
USP LEWISBURG

DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 768226-F1

CASE NUMBER: ______

Part C- RECEIPT

Return to:

LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

SUBJECT:

DATE

RECIPIENT'S SIGNATURE (STAFF MEMBER)

U.S. Department of Justice

Federal Bureau of Prisons

# Regional Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Massaro Joseph F — 83413-020 — H101 — Lewisburg
LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

Part A - REASON FOR APPEAL Dear Sirs,

I respectfully disagree w/this panels refusal of my compassionate release/Reduction in sentence request. I more than meet the requirements set forth in BOP policy # 5050.49, pg. 4 Article C.

I am 71 yrs old, have served 22 yrs, & my life expectancy is 74.4 yrs old.

The provision for "prisoners over 65" - asks for serving 10 yrs of sentence, &, or 75% of court ordered sentence.

Thank you

3/27/14
DATE

[signature]
SIGNATURE OF REQUESTER

Part B - RESPONSE

DATE

REGIONAL DIRECTOR

dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar ays of the date of this response.

RIGINAL: RETURN TO INMATE

CASE NUMBER:

art C - RECEIPT

CASE NUMBER:

eturn to:

LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

JBJECT:

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MASSARO JOSEPH F. — 85413-020 — H101 — Lewisburg

LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

Part A - REASON FOR APPEAL Request for relief according to B.O.P. policy under reg 5050.49. Sirs, I fully meet the criteria put forth for pris. over 65. I have more than 10yrs. in & more than 75% of my sente. At sentencing I was 50yrs old. 7/94. The "intent" of the Ct wi. access to the best reliable information available stated my life expectancy to be 74.4 yrs old. I.E. 24.4 yrs to live. 75 of 24.4 is 18yrs. I've completed 22 (6/92 Arrest date) that is 92% of my expected sentence according to the intent of the court.

I was not sentenced to death! Anything past my 74th birthday becomes a death sentence. As in; "Capitol punishment". As this was not a death penalty case I rely on the "compassion" of this board to re-consider my request for a reduction in sentence.

5/15/14

DATE

Joseph F. Massaro

SIGNATURE OF REQUESTER

Part B - RESPONSE

DATE

GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE

CASE NUMBER: ______

Part C - RECEIPT

CASE NUMBER: ______

Return to:

LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

SUBJECT:

DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

U.S. Department of Justice

Federal Bureau of Prisons
United States Penitentiary

Lewisburg, Pennsylvania 17837

September 12, 2014

MEMORANDUM FOR DAVID J. EBBERT, WARDEN

FROM: S. Stover, Unit Manager

SUBJECT: MASSARO, Joseph Reg. No. 83413-020
Program Statement 5050.49, Request for Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582©(1)(A) and 4205(g)

On September 10, 2014, H Block Unit Team reviewed inmate Massaro's prior request for a Reduction in Sentence (RIS) pursuant to the request of the National Inmate Appeals Administrator. The Unit Team reviewed the request in accordance with the above Program Statement.

Inmate Massaro may be considered under the criteria of "Other Elderly Inmate", which requires inmates to reach age 65 or older, who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced. Inmate Massaro meets this age requirement and has served over 22 years of his LIFE sentence. Upon secondary review, the below factors have been reviewed and it is the Unit Team's recommendation that inmate Massaro's RIS request be denied for the following reason(s):

X Would diminish the seriousness of the offense:

Nature and circumstances of the inmate's offense: Inmate Massaro was a "Soldier" in the Luchese Organized Crime Family and was a partner in, among other things, the enterprise's illegal gambling businesses and loansharking operations. Massaro participated in various aspects of the enterprise's criminal activities, including arson, extortion, the extortionate extension of credit, and murder. Inmate Massaro was charged with and found guilty of RICO Conspiracy, Murder in the Aid of Racketeering, Conspiracy to Commit Extortion, Conspiracy to Make Extortionate Extensions of Credit, and Conspiracy to Collect Extensions of Credit by Extortion, which resulted in a LIFE sentence.

Criminal History: Inmate Massaro's adult criminal history began at age 21 and includes the following charges: Promoting Gambling, Grand Larceny 1st Degree, Harassment, Petit Larceny, and Grand Larceny 4th Degree.

Comments from victims: The presentence report, paragraphs 111 through 125, contains victim impact statements. Victims stated they were terrified and terrorized by Massaro, their lives became a living hell, victims remained fearful of retribution, and they suffered financially from their losses.

Unresolved Detainers: None

Supervised Release Violations: None

Institutional Adjustment: Inmate Massaro is a Cadre Program participant at USP Lewisburg. He has maintained favorable institutional adjustment.

Disciplinary Infractions: Inmate Massaro received one (1) incident report since his incarceration in 1992. He was found guilty of Code 201 - Fighting in 1997, and has remained incident report free for the past 17 years.

Personal History: According to the presentence report, Inmate Massaro was married several times and has seven children. Massaro's RIS request states his wife is now deceased and he has 10 children, 23 grandchildren, and 6 great grand-children. He has no history of substance or alcohol abuse.

Length of Sentence/Amount of Time Served: Inmate Massaro is serving a LIFE sentence and has served approximately 22 years, 2 months, and 18 days to date.

Inmate's Current Age: 71

Inmate's Age at Time of Offense and Sentencing: Inmate Massaro was 46 years of age at the time of arrest, and 50 years of age at the time of sentencing.

Inmate's Release Plans: A release plan has not been developed as the inmate's current sentence is LIFE. Massaro's RIS request states he would have adequate medical and financial support available in the community.

Would Release Minimize Severity of Offense: The Court sentenced inmate Massaro to LIFE imprisonment. It is the Unit Team's determination that release would minimize the severity of the offense of Murder in the Aid of Racketeering.

Comments for review staff:

CMC:

Concur based on seriousness of offense [signature]

AWP:

Concur based on seriousness of offense Release is not appropriate [signature]

RIS Coordinator:

Concur - [signature]

Warden's Decision:

☑ AGREE - The inmate's request is denied for the above reason(s).

☐ DISAGREE - The inmate's request should not be denied at this time. The Unit Team should submit complete packet for RIS processing.

[signature]
David J. Ebbert, Warden

9/18/14
Date

U.S. Department of Justice

Federal Bureau of Prisons

# Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Joseph MASSARO F. — 83413-020 — H/01 — Lewisburg
LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

**Part A - REASON FOR APPEAL** I Appeal region's denial of my BP 10 - As untimely. under Spm. Ct. decision in Huston v Lack.
Also i Appeal Lewisburg Examining Boards e Warden Ebbert' Denial for my request for Compassionate release/Reduction of Sentence on the grounds of "Diminishing the Severity of The Crime." Please See explanation.

Thank You.

2/23/15
DATE

Joe Massaro
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED
MAR 16 2015
Administrative Remedy Section
Federal Bureau of Prisons

RECEIVED
JUN 08 2015
Administrative Remedy Office
Federal Bureau of Prisons

DATE

GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 799489-A2

**Part C - RECEIPT**

CASE NUMBER:

Return to: ______
LAST NAME, FIRST, MIDDLE INITIAL — REG. NO. — UNIT — INSTITUTION

SUBJECT: ______

DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

**MASSARO, Joseph**
Reg. No. 83413-020
Appeal No. 799459-R6
Page One

---

**Part B - Response**

You appeal the decision of the Warden at USP Lewisburg denying your request for compassionate release based on the criteria for other elderly inmate consideration. You allege you are eligible for compassionate release based on your age and number of years served. You request reconsideration for compassionate release.

Program Statement 5050.49, Compassionate Release/Reduction in Sentence states, the Director of the Bureau of Prisons may move the sentencing court to reduce the term of imprisonment of an inmate in particularly extraordinary or compelling circumstances which could not have been reasonably foreseen at the time of sentencing. When an inmate requests compassionate release consideration, the Warden at the institution reviews the request and determines whether the request should be denied or forwarded to the Office of General Counsel. Several factors are taken into account when reviewing a request for compassionate release.

As indicated by the Warden, your request was denied after review of your age and case details. Upon our review, we determined you may meet the age criteria, and initial review for service of the greater of 10 years or 75% of the term of imprisonment to which you were sentenced, as you have currently served 22 years, 10 months and 26 days of your life sentence. However, the institution reviewed other relevant factors in your case and determined that a reduction in sentence would minimize the severity of your offense. We find the Warden has properly exercised his discretion and we concur with his decision. Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons. Your appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534, within 30 calendar days of the date of this response.

Date: May 20, 2015

J. L. NORWOOD
Regional Director

General Counsel
Administrative Remedy Sec.

Joe Massaro 83413-020
PO Box 1000
Lewisburg, PA. 17837

6/2/15

Dear Sirs,

Once again i ask for a review of my refusal for C/Release - R/in Sentence request by NERO.

Enclosed is their denial. As you can see NERO simply rubber stamped L.E.B. (Lewisburg Examining Board) oppinion.

The bright side is they agree; A) i fit the age requirement, & B) Amt. of time served. I ask, "What must i do".

All NERO & LEB is concerned about is the decision 23 yrs. ago. No consideration at all for the now Joe Massaro. I see no evidence or mention of the goals i've achieved, or exemplatory conduct i've displayed since then. I truly wonder if NERO did their own eval, for they said; "we find the warden properly exercised his discretion & we concur w/his decision;" "Severity of the Crime".

Well this program put forth by the B.O.P. is not based on one mans discretion, but on fact.

Contd. ②

The fact that I meet every requirement for release That The BOP Asked For in prog. St 5050.49.

This administration doesn't know me, Warden Ebbet is brand new, the A.W.' are new, 1/2 The lieutenants & 1/2 The Staff Are new. So how can they possibly make A reliable judgement as to The Changes that I have made. institutional records reflects many support letter's From Staff, but yet no mention of those who know me best.

"Severity of The Crime," I've mentioned this before The Prosecutor offered me 10 yrs. A plea w/out Cooperation. My Co-defendant cooperated & only did 5yrs! In both instances "Severity of The Crime" was not much of A Concern to The D.O.J.

For Some reason NERO doesn't get it, on it's Face BOP program 5050.49 "is"! For Serious crimes, & doesn't say Otherwise.

③

Mine is not a death penalty case. So many factors lead to the institution of mercy for my request. Nebraska became the 19th state to abolish the death penalty. 153 prisioners were released from D/Row e changed the conscience of fair minded people that don't want to kill innocent people. They found that evidence is flawed, decisions relied on human behavior who can error - through honest mistakes, Prejudices, mind sets, greed, fraud e other frailities. I ask could it be LEB succumbed to some of these human deficits?

All i ask is a full examination of my record e who i am now. Taking into consideration my age, time served, e incident free impecable record.

Please carefully observe the mind set, that is protected by; Congress, DOJ, e the BOP in the

contd. (4)

Attached newsletter by Jeremy Gordon esq. Special attention to paragraph #3 (the easiest way to solve the problem). These calamities can only get worse if the B.O.P. doesn't get it's boats in the water before the flood of ever increasing older prisoners.

Please take a nice warm drink of mercy while reading my request, lets put this before the Courts where it belongs.

Bernie Kerrik; "if you're a convicted felon you're punished Till the day you die." (ex N.Y.C. police Commisioner)

My sentence will never end w/my release, but at least i'll be able to salvage what little life i have left.

Please be mindful, w/the changing laws, if tried today my sentence would be much less.

Thank You
& God Bless

Sincerely
Joe Manaro

P.S. We forgave Japan
more importantly;
"Japan forgave us"

(5)

PS. Program Statement 5050.49 States;

"The director of the BOP may move the Sentencing COURT to reduce the term of imprisonment of an in particular, extraordinary or Compelling Circumstances which could not have been reasonably forseen at the Time of Sentencing.

How could Judge Cedarbaum possibly have invisioned the turn around i've made in my life? OR So many other factors older prisoners concerning BOP issues, 23yrs, age?

I pray BOP uses it's discetionary powers & over rule LEB decision.

**Administrative Remedy No. 799459-A2**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal where you challenge the denial of your request for a reduction in sentence (RIS) based on the Other Elderly Inmates criteria. You request to be granted a RIS.

Title 18 of the United States Code, § 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary and compelling reasons. Pursuant to Program Statement No. 5050.49, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), Sec. 4(c), consideration for a RIS may be given to an inmate who is age 65 or older and who has served the greater of 10 years or 75 percent of the term of imprisonment to which he was sentenced. Also, all RIS requests should be assessed using the factors listed in Section 7.

We have carefully reviewed your request. You are 71 years old and have served over 23 years of your life term of imprisonment. Based on this and additional information, we are asking the Warden to reconsider your request. As such, we are remanding your request to the institution for reconsideration.

This response is provided for informational purposes only.

7/30/15
Date

Ian Connors, Administrator
National Inmate Appeals

U.S. Department of Justice

Federal Bureau of Prisons
United States Penitentiary

Lewisburg, Pennsylvania 17837

September 28, 2015

MEMORANDUM FOR DAVID J. EBBERT, WARDEN

FROM: J. Dressler, Unit Manager

SUBJECT: MASSARO, Joseph Reg. No. 83413-020
Program Statement 5050.49, Request for Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582©(1)(A) and 4205(g)

On September 28, 2015, H Block Unit Team reviewed inmate Massaro's two prior requests for a Reduction in Sentence (RIS) pursuant to the request of the National Inmate Appeals Administrator. The Unit Team reviewed the request in accordance with the above Program Statement.

Inmate Massaro may be considered under the criteria of "Other Elderly Inmate", which requires inmates to reach age 65 or older, who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced. Inmate Massaro meets this age requirement as he is currently 72 years of age, and has served over 23 years of his LIFE sentence. Upon this additional review, the below factors have been reviewed and it is the Unit Team's recommendation to uphold the prior decision that inmate Massaro's RIS request be denied for the following reason(s):

X Would diminish the seriousness of the offense:

Nature and circumstances of the inmate's offense: Inmate Massaro was a "Soldier" in the Luchese Organized Crime Family and was a partner in, among other things, the enterprise's illegal gambling businesses and loansharking operations. Massaro participated in various aspects of the enterprise's criminal activities, including arson, extortion, the extortionate extension of credit, and murder. Inmate Massaro was charged with and found guilty of RICO Conspiracy, Murder in the Aid of Racketeering, Conspiracy to Commit Extortion, Conspiracy to Make Extortionate Extensions of Credit, and Conspiracy to Collect Extensions of Credit by Extortion, which resulted in a LIFE sentence.

Criminal History: Inmate Massaro's adult criminal history began at age 21 and includes the following charges: Promoting Gambling, Grand Larceny 1st Degree, Harassment, Petit Larceny, and Grand Larceny 4th Degree.

Comments from victims: The presentence report, paragraphs 111 through 125, contains victim impact statements. Victims stated they were terrified and terrorized by Massaro, their lives became a living hell, victims remained fearful of retribution, and they suffered financially from their losses.

Warden's Decision:

☐ AGREE - The inmate's request is denied for the above reason(s).

☑ DISAGREE - The inmate's request should not be denied at this time. The Unit Team should submit complete packet for RIS processing.

David J. Ebbert, Warden

10/5/15
Date

U.S. Department of Justice

Federal Bureau of Prisons

Office of the General Counsel

Washington, DC 20534

JUL 0 5 2016

MEMORANDUM FOR DAVID J. EBBERT, WARDEN
UNITED STATES PENITENTIARY
LEWISBURG, PENNSYLVANIA

FROM: Kathleen M. Kenney
Assistant Director/General Counsel

SUBJECT: MASSARO, Joseph
Federal Register No. 83413-020
Request for Reduction in Sentence

Please be advised that Mr. Massaro's request for a reduction in sentence (RIS) pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and PS 5050.49, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), section 4(c) ("Other Elderly Inmates") is denied. We have carefully reviewed the documentation accompanying this request and have consulted with the Assistant Director for the Correctional Programs Division.

Mr. Massaro, age 73, has served 24 years of a life sentence. Based to the very serious nature of Mr. Massaro's offense, it is inappropriate to release Mr. Massaro pursuant to a RIS under section 4(c), Other Elderly Inmates. Accordingly, his RIS request is denied.

Please provide Mr. Massaro with a copy of this decision.

cc: Michael Carvajal, Regional Director, NERO

S.D.N.Y.–N.Y.C.
97-cv-2971
92-cr-529
Cedarbaum, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

---

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of October, two thousand sixteen.

Present:

Amalya L. Kearse,
Dennis Jacobs,
*Circuit Judges.**

---

Joseph Massaro,

*Petitioner,*

v. 16-3233

United States of America,

*Respondent.*

---

Petitioner moves for leave to file a successive 28 U.S.C. § 2255 motion. As a preliminary matter, the proposed § 2255 motion would be successive because Petitioner's first § 2255 motion challenged the same criminal judgment and was decided on the merits. *See Vu v. United States*, 648 F.3d 111, 113 (2d Cir. 2011). We reject Petitioner's argument that his claims were unripe until the issuance of the Supreme Court decisions discussed in his present motion; claims based on new Supreme Court decisions are clearly covered by the successive § 2255 provisions of 28 U.S.C. § 2255(h). Upon due consideration, it is hereby ORDERED that Petitioner's motion is DENIED because he has not satisfied the criteria set forth in § 2255(h).

Petitioner does not rely on any newly discovered evidence within the meaning of § 2255(h)(1). Furthermore, *Alleyne v. United States*, 133 S. Ct. 2151 (2013), did "not announce a new rule of Constitutional law that has been made retroactive by the Supreme Court." *United States v. Redd*,

---

* Raymond J. Lohier has recused himself from consideration of this motion. Pursuant to Second Circuit Internal Operating Procedure E(b), the matter is being decided by the two remaining members of the panel.

735 F.3d 88, 89 (2d Cir. 2013). The holding in *Redd* remains binding as it has not been overturned by any subsequent decision of this Court or the Supreme Court. Regarding Petitioner's ex post facto argument, he does not identify any rule of law made retroactive by the Supreme Court, and no such rule of law appears to exist. Finally, even if Petitioner's ex post facto argument arises under *Peugh v. United States*, 133 S. Ct. 2072 (2013), the rule announced in *Peugh* also "does not constitute a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." *Herrera-Gomez v. United States*, 755 F.3d 142, 148 (2d Cir. 2014) (internal quotation marks omitted).

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

UNITED STATES SECOND CIRCUIT COURT OF APPEALS

Catherine O'Hagan Wolfe

Inmate Name: Joseph Massaro
Register Number: 83413-020
United States Penitentiary
P.O. Box 1000
Lewisburg, PA 17837




RECEIVED
SCRANTON

JAN 31 2017

PER ________
DEPUTY CLERK

Clerk of the Court
U.S. District Court
Middle District of Pennsylvania
P.O. box 1148
235 N. Washington Avenue
Scranton, Pa. 18501-1148